## GRAFFAM & Another *v.* BURGESS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

Argued December 3, 1885.—Decided March 1, 1886.

A judicial sale of real estate will not be set aside for inadequacy of price, unless the inadequacy be so great as to shock the conscience, or unless there be additional circumstances against its fairness.

Great inadequacy of price at a judicial sale of real estate requires only slight circumstances of unfairness in the conduct of the party benefited by the sale, to raise a presumption of fraud.

If the inadequacy of price paid for the purchase of real estate at a sale on an

execution be so gross as to shock the conscience, or if in addition to gross inadequacy the purchaser has been guilty of unfairness or has taken any undue advantage, or if the owner of the property or the party interested in it has been for any other reason misled or surprised, then the sale will be regarded as fraudulent and void, and the party injured will be permitted to redeem the property sold.

Looking at the whole facts in this case the court finds traces of design on the part of plaintiff in error to mislead defendant in error, to lull her into security, and thus prevent her from redeeming her property sold on execution within the period allowed by the Statute of the State; and the court sustains the action of the court below in making a decree allowing redemption of the same after the expiration of that period.

After hearing of the proofs, a bill in equity may be amended so as to put in issue matters in dispute and in proof, but not sufficiently put in issue by the original bill.

This was a bill to redeem from a sale of real estate in Massachusetts under an execution issued from one of the State courts. The suit was commenced after the expiration of the period allowed by the Statutes of that State for redeeming from such a sale. The facts which make the case are stated in the opinion of the court.

*Mr. A. A. Ranney* for appellants.

*Mr. John Lowell* for appellee.

Mr. Justice Bradley delivered the opinion of the court.

This was a bill in equity filed on the 10th of July, 1880, by Christine J. Burgess, the appellee, against Peter Graffam, Samuel M. Fairfield, Edward B. Newhall, and others, to compel Graffam to deliver up to her certain lands and premises unlawfully held by him (as alleged), and for other and further relief.

The bill alleged that the complainant had for many years been the owner in fee simple of the premises in question, a house and lot in the town of Melrose, Middlesex County, Massachusetts, unencumbered and worth at least $10,000; that complainant generally occupied the property as a summer residence, and, when not occupying it herself, rented it out to tenants with the furniture therein; and that her general residence was with her husband in Providence, Rhode Island. It

was further alleged that in the fall of 1877 the complainant had some mason work done by Peter Graffam, one of the defendants, the bill for which was $23; that the complainant objected to paying the bill on the ground that the work was badly done; that in January, 1879, Graffam employed Samuel M. Fairfield, an attorney, one of the defendants, to sue the complainant for this bill, by attachment, in the Middlesex District Court, and that on the 10th of March, 1879, he recovered judgment against her for $28.95 damages and $16.15 costs:—That execution was issued on this judgment, and the whole property was sold by the sheriff, at his office in Malden, on the 17th of May, 1879; and that Graffam became the purchaser for $73.10, and the sheriff gave him a deed:— That in January, 1879, Edward B. Newhall, a real estate agent, pretending to have a claim of $30 against the complainant for services, employed Fairfield to sue the same, and an attachment was issued, and judgment recovered on the same 10th of March, 1879, and execution issued and levied on the interest of complainant remaining in the premises after the sale to Graffam:—And that a sale was made of said interest to Newhall on the 13th of August, 1879, for $81.21, and a deed was given to him by the sheriff accordingly. The complainant alleges that neither of these claims was valid against her, and that the parties knew it:—That when the levies and sales were made the complainant had $3000 worth of furniture and personal property in the house entirely unencumbered; and had a well-known agent in the neighborhood, and a tenant in the house until June 1, 1879, after which she occupied it herself until the fall; that she also had an attorney in Massachusetts known to the defendants; but that no notice of such sale was ever communicated to her, her attorney, agent, or tenant:—That in 1880, from and after the 1st of May, the complainant expended $1200 in repairs to the house and grounds:—That Graffam and the other defendants meanwhile conspired together to keep her in ignorance of the sale until the year, allowed by the statutes of Massachusetts for redeeming the property, had expired:—That in pursuance of this scheme Graffam bought out Newhall, who, by his subsequent

purchase, had a right to redeem the property from the sale to Graffam:—That the year for redemption having expired on the 17th of May, 1880, on the 22d of June thereafter, Graffam, Fairfield and others, during the temporary absence of the complainant from the house, seized their opportunity, entered upon the premises, broke into the house, and took possession of it in behalf of Graffam, removed all the funiture and other personal property, including the wearing apparel of complainant, of her husband and servant, took possession of her private correspondence and papers, and the sum of $170 in money, and still held possession of all of said property at the time of filing the bill:—That complainant, on being informed of this proceeding, immediately caused an investigation to be made, and for the first time learned of the sales made under the executions:— That she thereupon entered into negotiation with Graffam to try to get a settlement, and offered to pay him all that the property had been sold for, and such reasonable costs and charges as he had sustained; but that he refused any arrangement unless she would pay him $1100, which he claimed was due him by reason of the large sums he had expended to employ counsel and men to watch and advise him of the complainant's absence, so that he could take possession. The bill states that Graffam still had keepers in possession of the house, who were injuring it by their wanton conduct, and that the complainant was informed that Graffam intended to sell the property, and was soliciting offers for it. An answer under oath was waived. On the 16th of June, 1880, an amendment to the bill was filed, alleging that Graffam, to carry out his fraud, had conveyed the property to one Herbert F. Doble for the nominal consideration of $5000; and stated several circumstances to show that it was not a *bonâ fide* transaction. The deed was dated before the filing of the bill, but it was charged that it was not executed till afterwards, and that the date was a false one. Doble was made a party.

The defendants severally answered, but as the answers were not required to be under oath, it is unnecessary to recite them. The parties went into proofs, and the cause was heard before the court below, which, in January, 1882, announced its opinion,

that the case was one for redemption, but not for entire annulment of proceedings and unconditional surrender of the property on account of fraud; therefore, dismissing the bill against all the defendants except Graffam and Doble, the court gave the complainant leave to amend her bill on payment to the defendants of costs and reasonable counsel fees. The complainant amended her bill accordingly, by adding an offer to pay into court the amount of the two judgments recovered against her by Graffam and Newhall, with interest, and praying for permission to redeem the property, and that Graffam and Doble might be required to account for rents and profits, and to reconvey to her. This amendment was first objected to, and then demurred to, but objections and demurrer being overruled, the defendants filed an answer, setting up that the application to redeem came too late, and that no sufficient offer was made to entitle complainant to redeem; that defendants were entitled to $2000 for expenses, &c. The complainant paid into court the defendants' costs, $215.45, a counsel fee of $150 allowed by the court, and $181.24, the amount of the two judgments and sales under the same, with interest.

Thereupon, the court made a decree, dated April 21, 1882, whereby, after reciting the payment of the money into court by the complainant, and that the defendants, Graffam and Doble, had collected certain rents and made certain payments, and had made charges for services, and for the custody and care of the premises, and that these accounts and items had been submitted directly to the court without reference to a master, and the court having found and declared that the defendants, Graffam and Doble, were sufficiently paid by the rents received by them for all said charges and expenses, it was then decreed as follows, namely, " that the complainant is entitled to redeem the premises without further payments for such redemption; that the said defendants, Graffam and Doble, are entitled to receive the sums already paid into court for their benefit, and to retain the rents received by them; and that the said defendants, Graffam and Doble, make conveyance of the real estate described in the bill to the complainant, free from all encumbrances made or suffered by or through them." It

was also referred to a master to determine the form of conveyance to be made pursuant to the decree, to receive said conveyance, duly executed, and to deliver the same to the complainant, and report proceedings. The master reported the form of a deed, which was approved, and the defendants were ordered to execute it. From this decree the defendants, Graffam and Doble have appealed.

We do not propose to review the evidence in the case in detail. We have carefully examined it and find the principal allegations of the bill to be true, and are convinced that, whilst the complainant was apprised of the suits of Graffam and Newhall instituted against her by attachment, in her absence, in January, 1879, and employed counsel to defend them, yet that she was totally ignorant of the issue of executions on the judgments in those cases, and of the sale of her property under the same and of the legal rights which Graffam acquired, or might acquire, by the lapse of a year's time after the sale. We are satisfied that she was unconscious of the position in which her property stood, and that Graffam knew that she was unconscious of it, and endeavored to keep her so, and took an inequitable advantage of her ignorance to get possession of her property, and to get her in his power. Even if it be true, as the court below supposed, that the evidence was insufficient to make out a case of conspiracy and fraud, that would sustain a decree for unconditional delivery of the property as originally prayed, we think it is abundantly sufficient to justify the decree which the court below did make, allowing the complainant to redeem upon payment of debt, interest, costs, and counsel fees. In our judgment of the case, the defendants ought to be well satisfied with this disposition of the case.

It is a principle of law, as well as of natural justice, that greater consideration and care are due to persons known to be unable to take care of themselves, than to those who are fully able to do so. The driver of a team, seeing a child or a woman, or a person of known feeble intellect, in the street, is bound to exercise greater care and diligence to avoid doing them harm, than would be obligatory if it was a grown and capable man. In dealing with a man, whose rights, without his knowledge,

but which by due diligence he might know, are passing away by lapse of time into another's hands, the latter may, perhaps, justify himself in the eye of the law (though not in conscience) in preserving a wary and crafty silence, so as to put his victim off his guard and bring him into his own power, whilst he would be perfectly inexcusable in taking such advantage of a woman, unskilled in business, and unused to the stratagems which are sometimes resorted to by unscrupulous persons.

In view of this just standard of human action, which a court of equity always recognizes, the conduct of the defendant, Graffam, appears in a very unenviable light.

What is the scheme which has been carried out, and is now sought to be sustained in this court? Nothing more nor less than to get and keep possession of the complainant's property, worth $10,000, to satisfy a paltry claim of less than $200; and this has been accomplished by keeping from her all knowledge of the device, lulling her into security until the year for redemption passed by, having her operations watched and her footsteps dogged, and clandestinely seizing possession in her temporary absence.

It is insisted that the proceedings were all conducted according to the forms of law. Very likely. Some of the most atrocious frauds are committed in that way. Indeed, the greater the fraud intended, the more particular the parties to it often are to proceed according to the strictest forms of law.

Considering the amount of the stake to be won, and the overwhelming injury to be inflicted upon an unsuspecting woman, it is difficult to regard with equanimity the proceedings of the defendant as the year of redemption drew to its close, and after it had terminated. The fact is virtually admitted that he kept up a regular corps of spies to watch her movements whilst she was laying out hundreds of dollars in repairs on the property, in order to find a favorable moment, when she was absent, to take possession of her home; and that he seized such a moment, and did take possession, and removed all her furniture and chattels, even to her clothing and private papers, and virtually turned her into the streets. These admitted facts are enough of themselves to show the animus and

intent of the defendant. No man with an honest purpose, could have done this, whatever aggravation he may have had relating to the payment of his claim. There were other methods to which he could and would have resorted. A piano or a mirror would probably have satisfied his whole claim.

The pretence that, before striking the blow, he gave the complainant warning, by calling upon her and telling her that he had bought the premises, and that she must settle the case, does not palliate the defendant's conduct, or change its bearing on the case. It was evidently done, not for the purpose of getting his money, or getting an arrangement, but to give a better coloring to his proceedings. We only have his story as to what he said. The instructions of his lawyer were "to ask her for a settlement of the claims which he held, and to tell, her that, unless they were paid immediately, he would have to take it out of her property." This is probably what he said; and it was well calculated to mislead the complainant as to her real position and the defendant's intentions and power. She would not understand, from what he said, that her property was in any immediate peril. Why did he not tell her that the property was sold at sheriff's sale, and that the time for redeeming it was about expiring, and that if it expired he could retain the whole property forever? He evidently did not wish it redeemed, for then she would only have had to pay the debts, or the amounts bid. He wanted to get her into his power. He was willing to let her go on and spend some few more hundreds of dollars in repairs. These were certainly all, or mostly, made after the 17th of May. Standing by and seeing her doing this, and letting her go on without informing her of her position and of his rights, considering the character of the respective parties, was itself a fraud.

Mr. Brown, the complainant's counsel, having called upon Fairfield, as Graffam's attorney, after the seizure of the premises, to ascertain what arrangement could be made, testifies that the latter demanded for his client $750, and a full discharge of all liability on account of the removal of the personal property, and that one reason assigned by him for demanding such a large amount was that Graffam had spent a great deal

of his time in watching the property, and should be paid liberally. The witness continued, " I asked him what was the occasion of watching the property. He said they watched the property to see what Mrs. Burgess was doing with it until the year expired, and that since that he had employed men to watch the property in order to ascertain when Mrs. Burgess was away, so that they could get in and take possession. He said that arrangement continued until the 22d of June, when he received a dispatch at his office in Boston stating that Mrs. Burgess was away; that then he took some person with him from Boston, as a keeper, went to Melrose on the next train, and assisted in opening one of the back windows of the house, and went in and took out the property. I said to him, ' what was the need of your watching the property ? Did you not understand that before the year had expired from the date of the sale on the execution of Peter Graffam against Mrs. Burgess, Edward B. Newhall, the purchaser of the right of redemption under the subsequent sale on his execution, was bound to come in and redeem from the sale to Peter Graffam or lose his debt ? ' To which he replied that he understood that very well; that he advised his client, Peter Graffam, to purchase the Newhall title by sheriff's sale, and wait until the expiration of the year from the sale to Newhall before the matter was stirred up, and he added—I give his language almost *verbatim*—' Mr. Brown, we have had trouble enough with this woman, and we never intended that she should redeem this property if we could help it.' " " He repeated that when they went into this matter they intended to clean her out."

Fairfield denies these expressions, it is true; but they are so consonant with what actually took place, that we may suppose that he did not recollect precisely what he did say. Brown says that he caused the conversation to be taken down in short hand as soon as he returned to his own office. It is true that Fairfield's declarations ought not to be used against Graffam, except when made by him in the course of his business as Graffam's attorney. It is in this point of view that they have been noticed.

The testimony of Conant, the complainant's agent, is signifi-

cant in this connection. He was in Melrose when the defendant was removing the personal property. He went to the house to see what was the matter. He knew the teamster, and the man who was loading the wagon. He says: "I asked the cause of all this trouble. I conversed mostly with a black-haired man, who appeared to be the keeper in charge; he told me it was about a mason's bill. I asked him the amount, and also asked him for time to telegraph to Mrs. Burgess, and I would see that the bill was paid within ten minutes. He said, *No, she had had time enough.* This was between eight and nine o'clock at night. I stayed there about an hour."

In any light in which Graffam's conduct may be viewed, it is clear that he did not pursue an open, straightforward course. As we view the proofs, he evidently conceived the design of getting the complainant's property for a mere nominal consideration, or else, of getting her into his power so as to compel her to comply with any exorbitant demands he might choose to make. He knew she was ignorant of the sale, and of the position in which the sale placed her. He stood by and saw her expending large sums of money on the property in total unconsciousness of his proceedings, and of the means of injuring her which he held in his hands. Instead of undeceiving her he gave her a mere perfunctory notice, that if she did not settle the claims which he held he would have to take it out of her property, and pursued just such a course as was calculated to lull instead of exciting any suspicions of the real danger in which she stood, all the time purposing to take possession of the property for his own use as soon as her back was turned, and keeping spies to watch her proceedings, and to find a favorable opportunity of clandestinely slipping into the premises in her absence. If this is not fraud, we should have great difficulty in defining what fraud is.

That the defendant sought to put all possible embarrassments in the way of the redemption of the property, is evinced by the device resorted to of getting an assignment of Newhall's claim. Newhall had purchased all the interest of the complainant remaining in the property after the sale to Graffam, which included the right of redemption. The testimony given on this

subject by Graffam's counsel, Fairfield, indicates the object of this move.  "I formed," says he, "an opinion in the premises that Newhall had a right to redeem the Graffam title or claim, and as I was counsel for both, I stated to Newhall that he had the right if he desired it, and told him and Peter Graffam, also, that one had better buy the other out and hold both claims. Newhall was not disposed to do it and Graffam was, so I settled the matter in that way."

Then the pretended sale to Doble, at the time, and under the circumstances it was made, shows a design to place the property beyond the complainant's reach.  It is very obvious, from the evidence, that this was a sham sale.  Graffam evidently saw that a day of reckoning was coming, and the property must be placed out of his hands.  A deed was drawn with the nominal consideration of $5000, first, to N. L. Graffam, one of Peter Graffam's counsel in the case.  That was abandoned.  The deed was changed by erasing N. L. Graffam's name and inserting Doble's under an arrangement in writing, which writing was called for and promised, but never produced, but we infer from Doble's own testimony that he was to be held harmless.  This change was not effected until the 13th of July, 1880, three days after the bill was filed in this case; but the date of the deed is the 6th of July and the date of the acknowledgment (taken before the attorney, Fairfield,) is the 7th of July, which, of course, cannot be the true date, since it is testified that the acknowledgment was not taken until Doble gave his check, which is dated the 13th.  Doble testifies that he was to pay $1600 for the property, the consideration in the deed being $5000, and the property worth $10,000.  The transaction is marked all over with evidences of fraud and simulation.

Looking at the whole case, the traces of design on the part of Graffam to mislead the complainant, to lull her into security, and thus to prevent her from redeeming the property, are abundantly manifest, and such design must be assumed as an established fact in the case.

It is hardly necessary to cite authorities on a matter the solution of which depends on the application of such obvious principles of equity and justice.  As already perceived, we

do not rest our conclusion alone upon the gross inadequacy of the consideration of the sale; but upon that, in connection with the unfair conduct of the defendant in taking advantage of the complainant's ignorance of the sale, and giving her no intelligible notice or intimation of it, or of his intended seizure of the property after the year of redemption had passed, but standing by and seeing her expend large sums of money upon it, even after the year had expired. This, we think, presents a case sufficiently strong to justify the action of the court below, at least to the extent to which it went in making the decree appealed from. A few legal propositions, with a reference to the decisions on which they rest, is all that we deem it necessary to state.

It was formerly the rule in England, in chancery sales, that until confirmation of the master's report, the bidding would be opened upon a mere offer to advance the price ten *per centum.* 2 Daniell's Ch. Pr., 1st Ed. 924; 2d Ed. by Perkins, 1465*, 1467*; Sugden on Vendors & Purchasers, 14th Eng. Ed. 114. But Lord Eldon expressed much dissatisfaction with this practice of opening biddings upon a mere offer of an advanced price, as tending to diminish confidence in such sales, to keep bidders from attending, and to diminish the amount realized. *White* v. *Wilson*, 14 Ves. 151; *Williams* v. *Attenborough*, Turner & Russell, 75; *White* v. *Damon*, 7 Ves. 30, 34. Lord Eldon's views were finally adopted in England in The Sale of Land by Auction Act, 1867, 30 and 31 Vict., c. 48, § 7, so that now the highest bidder at a sale by auction of land, under an order of the court, provided he has bid a sum equal to, or higher than, the reserved price (if any), will be declared and allowed the purchaser, unless the court or judge, on the ground of fraud or improper conduct in the management of the sale, upon the application of any person interested in the land, either opens the biddings, or orders the property to be resold. 1 Sugden on Vendors & Purchasers, 14th Ed. by Perkins, 114, note (*a¹*).

In this country Lord Eldon's views were adopted at an early day by the courts, and the rule has become almost universal, that a sale will not be set aside for inadequacy of price, unless

the inadequacy be so great as to shock the conscience, or unless there be additional circumstances against its fairness; being very much the rule that always prevailed in England as to setting aside sales after the master's report had been confirmed. *Livingston* v. *Byrne*, 11 Johns. 555, 566, [1814]; *Williamson* v. *Dale*, 3 Johns. Ch. 290, 292, [1818]; *Howell* v. *Baker*, 4 Johns. Ch. 118, [1819]; *Tiernan* v. *Wilson*, 6 Johns. Ch. 411, [1822]; *Duncan* v. *Dodd*, 2 Paige, 99, [1830]; *Collier* v. *Whipple*, 13 Wend. 224, 226, [1834]; *Tripp* v. *Cook*, 26 Wend. 143; *Lefevre* v. *Laraway*, 22 Barb. 167, 173; *Seaman* v. *Riggins*, 1 Green's Ch. (2 N. J. Eq.) 214; *Eberhardt* v. *Gilchrist*, 3 Stockt. (11 N. J. Eq.) 167; *Campbell* v. *Gardner*, 3 Stockt. (11 N. J. Eq.) 423; *Marlatt* v. *Warwick*, 3 C. E. Green, (18 N. J. Eq.) 108; *Klœpping* v. *Stellmacker*, 6 C. E. Green, (21 N. J. Eq.) 328; *Wetzler* v. *Schauman*, 9 C. E. Green, (24 N. J. Eq.) 60; *Carson's Sale*, 6 Watts. 140; *Surget* v. *Byers*, Hempst. 715; *Byers* v. *Surget*, 19 How. 303; *Andrews* v. *Scoton*, 2 Bland, 629; *Glenn* v. *Clapp*, 11 G. & J. 1; *House* v. *Walker*, 4 Maryland Ch. 62; *Young* v. *Teague*, 1 Bailey Eq. 13, 14; *White* v. *Floyd*, Speer's Eq. 351; *Hart* v. *Bleeght*, 3 T. B. Mon. 273; *Reed* v. *Carter*, 1 Blackford, 410; *Pierce* v. *Kneeland*, 7 Wisc, 224; *Montague* v. *Dawes*, 14 Allen, 369; *Drinan* v. *Nichols*, 115 Mass. 353.

From the cases here cited we may draw the general conclusion that, if the inadequacy of price is so gross as to shock the conscience, or if, in addition to gross inadequacy, the purchaser has been guilty of any unfairness, or has taken any undue advantage, or if the owner of the property, or party interested in it, has been for any other reason, misled or surprised, then the sale will be regarded as fraudulent and void, or the party injured will be permitted to redeem the property sold. Great inadequacy requires only slight circumstances of unfairness in the conduct of the party benefited by the sale to raise the presumption of fraud.

In *Howell* v. *Baker*, *ubi supra*, where the case was a sale by a sheriff, grossly inadequate as to price, and was made on a stormy day, and the attorney was the purchaser, and no one was present but him and the sheriff, Chancellor Kent held the

purchaser as a trustee for both parties, and allowed the debtor to redeem.

In *Klœpping* v. *Stellmacker*, where there was a sheriff's sale for fifty-two dollars, of property worth two thousand dollars, belonging to a party who was ignorant, stupid and perverse, and would not believe that his property would be sold for such a paltry amount, though told that it would be, Chancellor Zabriskie, after conceding that mere inadequacy of price at a sheriff's sale is not sufficient ground to set aside a conveyance, added: " But when such gross inadequacy is combined with fraud or mistake, or any other ground of relief in equity, it will incline the court strongly to afford relief. The sale in this case is a great oppression on the complainants. They are ignorant, stupid, perverse, and poor. They lose by it all their property, and are ill fitted to acquire more. They are such as this court should incline to protect, notwithstanding perverseness." The Chancellor allowed the complainant to redeem the property by paying the purchase price and costs.

*Byers* v. *Surget*, 19 How. 303, was a case of sheriff's sale at a very grossly inadequate price, and the purchaser was an attorney in the case. Mr. Justice Daniel, delivering the opinion of this court, after giving a history of the transaction, said: " Such is the history of a transaction which the appellant asks of this court to sanction ; and it seems pertinent here to inquire, under what system of civil polity, under what code of law or ethics, a transaction like that disclosed by the record in this case, can be excused, or even palliated."

The two cases cited from the Massachusetts Reports, were sales by mortgagees ; but the principles on which these cases rest are the same as in those of sale by the sheriff or other officer. In *Drinan* v. *Nichols*, the sale was made in apparent good faith, except that the mortgagee knew that the owner had paid the accruing interest to the former owner who had given the mortgage, and expected that he would pay it over to the mortgagee. But this not being done, the mortgagee made the sale, without giving any notice to the owner. The court, speaking through Judge Endicott, say : " The mortgagee knew that the plaintiff, as administrator of her husband's estate, intending to

protect the interests of his minor children, had actually paid the money through the accustomed channel, and expected it would be paid by Pope to the mortgagee. With such knowledge of the position and expectation of the plaintiffs, a proper execution of the power, and a due regard to the rights and interest of the mortgagor or those having his estate in the premises, required of the mortgagee, when after a reasonable time it became evident that Pope would not pay, that notice should be given to the plaintiff, and a bare compliance with the terms of the power was not sufficient." This case, in its principles, is very analogous to the one now under consideration.

Mr. Kerr, in his treatise on Fraud and Mistake, says : " Inadequacy of consideration, if it be of so gross a nature as to amount in itself to conclusive and decisive evidence of fraud, is a ground for cancelling the transaction." Kerr on Fraud, Am. Ed. 186. Chancellor Desaussure, in the case of *Butler* v. *Haskell*, 4 Desaussure, 651, 697, on the same subject, says : . " I consider the result of the great body of the cases to be, that wherever the court perceives that a sale of property has been made at a grossly inadequate price, such as would shock a correct mind, this inadequacy furnishes a strong, and in general a conclusive, presumption, though there be no direct proof of fraud, that an undue advantage has been taken of the ignorance, the weakness, or the distress and necessity of the vendor; and this imposes on the purchaser a necessity to remove this violent presumption by the clearest evidence of the fairness of his conduct."

It is true these observations, both of Mr. Kerr and Chancellor Desaussure, were made in reference to private sales between parties, and do not strictly apply to judicial sales. But they show that great inadequacy of price is a circumstance which a court of equity will always regard with suspicion, unless it appears by the circumstances of the case, or by evidence. that it is no fault of the buyer.

Some technical objections, however, have been raised. It is said that it was error in the court to allow the amendment to redeem. We see no error in this. The case as set out in the original bill was one. either for annulling the sheriff's sale and decreeing an unconditional delivery of the property, or for a

redemption on payment of the amount due. The original prayer was for the former, and for such other and further relief as to the court should seem meet and the nature of the case might require. The prayer might have been in the alternative, either for an unconditional delivery of the property, or, in case the court should not deem that proper, then for leave to redeem. Had there been an offer to pay the debt the prayer for general relief would probably have been sufficient to enable the court to decree a redemption. But as the case made by the bill was full to the purpose of such a decree, except the formal offer, and as the proofs supported the bill to that extent at least, we think the court did perfectly right in allowing the amendment to be made. Lord Redesdale says : " If upon hearing the cause the plaintiff appears entitled to relief, . . . if the addition of parties alone is wanted, an order is usually made for the cause to stand over, with liberty to amend the bill by adding the proper parties; and in some cases where a matter has not been put in issue by bill with sufficient precision, the court has, upon hearing the cause, given the plaintiff liberty to amend the bill for the purpose of making the necessary alteration." Redesdale Eq. Pl. 326 ; and see *The Tremolo Patent*, 23 Wall. 518, 527. " So the court will sometimes at the hearing permit the prayer of the bill to be amended, so as to make it more consistent with the case made by the plaintiff than the one he has already introduced." 1 Daniell's Ch. Pr., 1st Ed. 474 ; Ib. 2d Ed. 480 ; and see *Neale* v. *Neales*, 9 Wall. 1 ; *Hardin* v. *Boyd*, 113 U. S. 756, 764. So a formal charge of fraud may be added when it is necessary and has been omitted. *Wamburzee* v. *Kennedy*, 4 Desaussure, 474, 480.

It is also objected that, as the bill was originally founded on a charge of fraud, and the fraud was not proved, the bill should have been dismissed. It is true the fraud and conspiracy may not have been proved to the extent and in precisely the aspect in which they were charged in the bill, so as to authorize the specific relief originally prayed for; but we think we have shown that very material fraud was proved, sufficient to justify the court in relieving the complainant against the lapse of time for redeeming her land.

Other objections of a technical character are also raised, but we do not deem it necessary to notice them. Our views of the merits of the case are such that, whilst the complainant has not seen fit to take an appeal, and, therefore, can only ask for an affirmance of the decree, yet that no mere formal objections ought to stand in the way of such affirmance. A decree cannot justly be rendered for the defendants.

The decree of the Circuit Court is *Affirmed.*

MR. JUSTICE MILLER, with whom concurred MR. JUSTICE WOODS, MR. JUSTICE MATTHEWS, and MR. JUSTICE GRAY, dissenting.

In a great many of the States of the Union a period is allowed of from twelve to fifteen months to redeem real estate from sale under execution, by payment of the amount for which it was sold, and interest on that amount. In nearly all these States this right of redemption attaches in sales made under chancery decrees as well as judgments at law.

In such cases, whether the statute, as in Massachusetts, provides that the conveyance shall be made by the sheriff or other officer immediately after the sale, or, as in many of the western States, only at the end of the time allowed for redemption, the title of the purchaser does not become absolute until that time has expired. In the case before us, it is not denied that the appellant received the sheriff's deed in accordance with the law of the State, and that the appellee failed to redeem within the time allowed.

It is of the utmost importance where this redemption law prevails, that the right thus granted should be strictly exercised according to the statute. For, in addition to the sanctity which the law concedes to judicial sales, founded on well-considered reasons of policy as old as the law itself, the favor of allowing the debtor one year more to save his land, after judgment and sale under execution have fixed his rights, only adds to his obligation to exercise the right thus granted in strict accordance with its terms.

In the case before us the judge who rendered the decree below stated that the conspiracy charged in the bill was not

proved, nor did he rely upon any act of fraud, and for that reason he refused to set aside the sale, but permitted, under a new prayer in the bill, the appellee to redeem on payment of the debt, interest and all costs, including fees of counsel. The counsel of appellee in the brief expressly declines to rely upon an actual fraud on the part of Graffam. In our opinion there is no evidence of such misconduct on his part as afforded any ground, in law or equity, to justify appellee in her failure to redeem from the sale. There is no reason why she did not pay the judgment rendered against her, of which she had full notice. Certainly no obstruction was interposed to her exercise of the right of redemption, and no promise made to induce her to forego it. Yet, after Graffam had acquired a complete legal title under judicial proceedings which were unimpeachable, the court treats the case as if the whole matter was still *in fieri,* and gives further time for redemption.

I do not deem it appropriate to enter into the discussion of the evidence in this case, but I dissent from the judgment and the opinion of the court as leading to evil results, in discrediting judicial sales, and embarrassing the due and just exercise of the right of redemption, by turning it into a question of judicial discretion.

JUSTICES WOODS, MATTHEWS and GRAY concur in this opinion.