410 F.2d 1182
 Harold SHLENSKY, Appellant,
v.
H. R. WEISSBERG CORPORATION and Harry A. Ash, Trustee, Appellees.
H. M. ROSENTHAL and Dunbar Builders Corporation, Appellants,
v.
H. R. WEISSBERG CORPORATION and Harry A. Ash, Trustee, Appellees.
 Nos. 17432, 17433.
 United States Court of Appeals Seventh Circuit.
 April 25, 1969, Rehearing Denied May 20, 1969.
 
 Claude A. Roth, Charles D. Stein, Mark S. Lieberman, Gottlieb and Schwartz, Chicago, Ill., of counsel, for appellant Harold Shlensky.
 Albert E. Jenner, Jr., Gilbert H. Hennessy, Jr., John J. Crown, Nicholas D. Chabraja, Jenner & Block, Chicago, Ill., of counsel, for appellants Herbert M. Rosenthal and Dunbar Builders Co.
 J. H. Schwartz, Malcolm M. Gaynor, Robert Dunn Glick, Chicago, Ill., for appellee H. R. Weissberg Corporation, Debtor, and Leonard Gesas, Chicago, Ill., for appellee Harry A. Ash, Trustee.
 Frank C. Bernard, Edwin A. Rothschild, Otis H. Halleen, Ralph R. Mickelson, Michael L. Levanthal, Jr., Sonnenschein, Levinson, Carlin, Nath & Rosenthal and Holleb, Michelson & Gerstein, Chicago, Ill., of counsel, for appellee Marshall M. Holleb.
 Bernard M. Mamet, Chicago, Ill., for Edgewater Beach Hotel Employees' Profit Sharing & Retirement Plan, in support of appellee's position.
 Glenn A. McTavish, Bernstein, Golan, McTavish & Yalowitz, Chicago, Ill., of counsel, amicus curiae.
 Before SWYGERT, FAIRCHILD and CUMMINGS, Circuit Judges.
 FAIRCHILD, Circuit Judge.
 
 
 1
 Appeals from an order of the district court approving a sale in a chapter X reorganization proceeding. The appellants are bidders whose bids were rejected.
 
 
 2
 The debtor H. R. Weissberg Corporation ration owns several hotels, including the Edgewater Beach Hotel at Chicago. The trustee concluded and the court decided that sale of the Edgewater Beach property other than pursuant to a plan of reorganization is appropriate. No one challenges this conclusion nor the underlying evaluation of circumstances.
 
 
 3
 The Edgewater Beach property is subject to encumbrances totalling about $7,000,000, including three mortgages, a furniture security agreement, mechanics' liens, and taxes. The property had been damaged by fire. The trustee has brought action against the insurer in which the trustee claims in excess of $35,000. The insurer appears to have offered some $72,000. In September, 1968 the trustee received an offer of $100,000 for his equity, if the trustee kept the insurance claim; $200,000, if the buyer got it. The buyer would also indemnify the trustee from lienholders' claim for deficiency.
 
 
 4
 The Court ordered a sale October 9; it was widely advertised and bidding took place before the court. There was no bid for the property free and clear of encumbrances. The highest bid received was $410,000 for the equity, with the buyer receiving the insurance claim, but without the buyer's agreement to indemnify. The court rejected all bids and authorized the trustee to sell at public or private sale, subject to court approval.
 
 
 5
 The trustee elected to invite sealed bids, to be opened at a hearing before the court November 22. Counsel for the trustee announced that after he opened and read the bids there would be a recess, after which a further bid could be made, followed by evaluation of the bids. Later in the hearing he said: 'I think the spirit and the basis upon which these bids are being offered today are with finality.'
 
 
 6
 During the course of the transactions referred to, from September 6 to November 22, the bids were for the trustee's equity in the property, except for one bid (Rosenthal and Dunbar) for the property free and clear of encumbrances. Some of the bids for the equity contemplated that the purchaser would receive the fire insurance claim, but some did not. Some of the bids for the equity included an agreement by the bidder to indemnify the estate from claims for deficiency on behalf of holders of encumbrances. Trustee's counsel had indicated that the indemnity agreement had significant value to the estate. The variations just referred to made comparison of bids difficult.
 
 
 7
 The bid which the court approved and ordered the trustee to accept is referred to as the Holleb bid, since Attorney Marshall M. Holleb is the nominee for the bidders. As presented after the recess November 22, it was an offer of $800,000 for the trustee's equity, and included an agreement to indemnify. With respect to the insurance claim, it was in the alternative: the trustee could keep the insurance claim, or could transfer it to Holleb at a price to be mutually agreed upon. By letter dated November 27, the Holleb bidders agreed to pay the trustee's price of $200,000 for the insurance claim. Letters dated December 2 further supplemented or clarified the Holleb offer in respects which need not be considered here. He had deposited $100,000 November 22.
 
 
 8
 Appellant Shlensky, whose last November 22 bid was $960,000 for the equity and the insurance claims, without an agreement to indemnify, asserts that his bid, as made or modified December 6, should have been deemed highest and best. He asks that we reverse, with directions to order his December 6 bid accepted. It was an offer of $960,000 for the equity, with the trustee permitted to retain the insurance claim, and with an agreement by Shlensky to indemnify. He had deposited $25,000 November 22, but increased it to $100,000 December 6.
 
 
 9
 Appellants Rosenthal and Dunbar do not assert that their free and clear bid, made November 22, was highest and best. They argue that under the circumstances the sale was not fair and impartial; that we should reverse with directions to reopen the sale 'subject to firm and specific guide lines.'
 
 
 10
 Four bids were submitted November 22: Holleb, Shlensky, Rosenthal-Dunbar, and D'Angelo. It is unnecessary to consider the details of the latter two. Rosenthal and Dunbar bid $8,150,000, free and clear, with the final payment in four years. D'Angelo bid $878,000 for the equity, would receive the insurance claim, and would indemnify. He announced withdrawal at the hearing on confirmation. No one challenges the conclusion that Rosenthal-Dunbar and D'Angelo were inferior to the other two. Holleb's November 22 bid was better than Shlensky's of the same date with respect to the indemnity provision and the deposit of earnest money. One can only determine whether the Holleb offered price was higher by assigning a liquidation figure to the insurance claim. If one chooses the $72,000 insurance company offer, the Shlensky price was higher. If one assigns any figure above $160,000 to the insurance claim, the Holleb price was higher.
 
 
 11
 November 27, after the close of the hearing, Holleb agreed to a $200,000 figure for the insurance claim. At least in form, he could argue that this was merely a filling in of his November 22 offer.
 
 
 12
 On December 6, Shlensky changed his November 22 offer by permitting the trustee to keep the insurance claim, giving an agreement to indemnify, and increasing his deposit. Comparing Shlensky's December 6 bid with Holleb's November 22-27 bid, the two are the same with respect to indemnity and deposit. In order to compare the price, it is again necessary to assign a liquidation figure to the insurance clim. Assigning the $72,000 figure, the Shlensky price is higher by $32,000, and assigning higher figures will produce a greater difference in favor of the Shlensky bid.
 
 
 13
 On December 11, the trustee's attorney, at the request of the court, asked each bidder to state the use it intended to make of the property and to give evidence of the bidder's ability to perform on approval of the bid. Holleb was the only bidder who replied. His letter named the architects who had been engaged, described their preferred concept for development of the site for residential use, and estimated the times at which portions of the project would be started and completed. Shlensky's counsel stated orally at the hearing on confirmation that he had been unable to reach a conclusion as to the best use for the property.
 
 
 14
 The December 6 Shlensky bid would produce a higher price than the November 22 Holleb alternative under which the trustee would keep the insurance claim. It seems probable that the December 6 Shlensky bid would also produce a higher price than the Holleb alternative under which Holleb would take the insurance claim in return for $200,000 (the bid which the district court approved).
 
 
 15
 The trustee had sought to make November 22 the final bidding day, and takes the position that this maneuver was responsible for bringing out much better bids than previously obtained. The district court was faced with the question of how much weight to give to the concept of finality as against the improvement in price represented by Shlensky's tardy offer, and the question whether the same concept of finality would prevent considering Holleb's specification, on November 27, of the amount in the alternative which he had left open to negotiation November 22.
 
 
 16
 Counsel for the Securities and Exchange Commission, whose recommendations had been invited by the court, took the position while the matter was under consideration in the district court that the December 6 Shlensky bid 'is $160,000 more than the Holleb bid 'assuming the $200,000 value for the insurance claim agreed upon by the Trustee and Holleb)' and that 'We know of no reason * * * why (the Court) may not, in its discretion, accept modifications of the earlier bids which result in a higher price and greater benefit to the estate.' The commission has taken no position in this court on appeal.
 
 
 17
 After a hearing, at which the district court announced its decision to approve the Holleb bid, detailed findings, conclusions and order were filed. It is apparent that in exercising his discretion the district judge gave weight to the concept of finality as tending to maintain the sanctity and integrity of a judicial sale. He concluded, however, that the Holleb communication subsequent to November 22 could reasonably be deemed a clarification of the Holleb November 22 bid, so that the bid as so supplemented could be considered consistently with the concept of finality; Shlensky's December bid, however, was reasonably deemed a new bid, consideration of which would undermine the concept of finality. The district judge also gave weight to the fact that only Holleb had responded to the request for a plan of development and showing of ability to perform, and had supplied evidence of a commitment of a responsible life insurance company to provide required funds.
 
 
 18
 No claim has been made that the November 22 bids were inadequate. Indeed, as noted by the district court, an appraisal made during the chapter XI proceeding which immediately preceded the chapter X proceeding had valued the property, apparently after the fire loss, at $5,100,000, considerably less than the encumbrances.
 
 
 19
 The sale, having been confirmed, can only be set aside for an abuse of discretion.[1] We are unable to find an abuse of discretion under the circumstances disclosed by this record.
 
 
 20
 The policy of giving great weight to observing the finality of the bidding day has long been recognized.
 
 
 21
 In England, it was formerly the rule that bidding would be reopened until confirmation upon an offer to advance the price.
 
 
 22
 'But Lord Eldon expressed much dissatisfaction with this practice of opening biddings upon a mere offer of an advanced price, as tending to diminish confidence in such sales, to keep bidders from attending, and to diminish the amount realized.'[2]
 
 
 23
 Parliament responded to the problem noted by Lord Eldon by passing the Sale of Land by Auction Act which provided that the highest bidder at a sale by auction would be declared the purchaser in the absence of fraud or other improprieties.[3] This rule was adopted by the great majority of American courts. The rule is an expression of the general policy that the setting of cut-off dates for the receipt of bids will, in the long run, produce better bids with the least delay.
 
 
 24
 A number of cases do hold that the district court has discretion to reopen the bidding where the highest bid before the cut-off date is inadequate and a later higher bid is made. In such situations, the district court may order the property sold to the later, higher bidder.[4] These cases do not hold that the court must order the property sold to the later, higher bidder. They merely say that the court may order the property sold to him.
 
 
 25
 Appellants have argued that the district judge should not have given weight to the fact that he was favorably impressed by the type of project described by Holleb as the 'preferred concept' of the architects engaged by his group. The judge did express enthusiasm for the type of project described in view of the fact that the Edgewater Beach property is a choice location on Chicago's lake front. There are some circumstances under which a court may consider the fact that a particular bidder will make a use of the property which serves community interest.[5] We think favorable consideration of the type of development under consideration by the Holleb group was no more than a 'make weight' here, and did not exceed proper bounds.
 
 
 26
 We can not agree that the fact that the bidders were not required, by advance prescription, to make offers on identical, or alternative sets of, conditions, nor the fact that the Holleb November 22 offer had an alternative subject to later negotiation, which was carried out, so undermine the integrity of dignity of the sale that it was an abuse of discretion not to reopen it under more specific preconditions.
 
 
 27
 The record discloses that in September the trustee received an offer (from Holleb) of $100,000 for the equity, the trustee keeping the insurance claim, or $200,000, the purchaser taking it with an indemnity by the purchaser in either event. A sale before the court on October 9 was widely advertised. It was conducted as an auction. The high bid was $410,000 for the equity, the purchaser taking the insurance claim, but without indemnity. Shlensky and Holleb were the only bidders, but several others expressed an interest. The trustee explained his interest in an indemnity provision.
 
 
 28
 The Rosenthal-Dunbar free and clear offer ($8,000,000, with final payment in four years) was thereafter received and was considered November 22. The three original sealed bids for the equity were: D'Angelo-- $400,000, the purchaser taking the insurance claim and giving indemnity; Holleb-- $775,000 on the same conditions; and Shlensky $700,000, the purchaser taking the insurance claim, but not giving indemnity. After the recess the Holleb and Shlensky bids were revised as already stated; D'Angelo's bid was raised to $878,000 and Rosenthal-Dunbar to $8,150,000.
 
 
 29
 The hotel operation ceased some time ago, the property is expensive to maintain, and a lease to a temporary tenant (Loyola University) expired January 31.
 
 
 30
 The results of the efforts from September 6 to November 22 were highly successful for the estate. Although only a few serious bidders came forward, there appears to have been full opportunity for interested persons to bid. We think the district court resolved the questions presented in a manner which can not be said to be an abuse of discretion.
 
 
 31
 When the urgency of these appeals was brought to the attention of this court by motion, this court expedited the filling of briefs, heard oral argument April 2 and entered its judgment affirming the order April 4, 1969, noting that this opinion would be filed.
 
 
 32
 SWYGERT, Circuit Judge (dissenting).
 
 
 33
 Several circumstances, I believe, require a reversal. The lack of conditions and ground rules prescribed in advance of receiving bids, the unequal treatment accorded the unsuccessful bidders, especially Shlensky, and the reliance upon extraneous esthetic considerations created a situation surrounding the sale that was so irregular as to amount to a gross abuse of discretion on the part of the district judge.
 
 
 34
 Initially, a public sale of the Edgewater Beach Hotel was ordered for October 9, 1968. The court rejected all bids received on that date as being insufficient in amount and authorized the trustee to sell the hotel at private sale without notice, but subject to the approval of the court. Thereafter, at a hearing held on November 22, 1968 at 2 P.M., four sealed bids were received and opened in court. Counsel for the trustee then requested a recess for the purpose of receiving amended bids. Three hours later the hearing was resumed. In response to a question from the attorney representing the Securities and Exchange Commission, the trustee announced that 'this is the final bidding hour as far as the trustee is concerned, unless the court shall direct otherwise.'
 
 
 35
 At the resumption of the hearing revised bids were received. Holleb bid $800,000 for the trustee's equity and assignment of the fire loss claim proceeds or 'at the option of the trustee, an amount equal to such fire loss as agreed upon between the trustee and the buyer.' He also offered to indemnify the estate against claims of those holding liens on the real estate. Shlensky bid $960,000 for the trustee's equity, including whatever might be the fire loss claim proceeds. Dunbar bid $8,150,000 for the hotel property, free and clear of liens and encumbrances.
 
 
 36
 Before adjournment, the attorney for the Securities and Exchange Commission inquired whether it would be acceptable if any of the bidders increased their cash offer during the time the bids were under consideration. The trustee said that it would not be acceptable. The judge then said, 'I think the position I understand the trustee to have taken is that as far as the trustee is concerned hs is finished with asking for bids.' The hearing was adjourned until a date in December in order to provide time for consideration of the bids.
 
 
 37
 On November 27, four days after the close of the bidding, Holleb wrote the trustee that he would agree to purchase the fire loss claim for $200,000. He stated in his letter, 'That amount is to be added to the $800,000 in cash above referred to, making a total price of $1,000,000.' On December 2 Holleb again wrote a letter to the trustee in which he agreed to indemnify the estate for secured claims against the personal property owned by the hotel. The first part of the letter read, 'In connection with the undersigned's offer to you to purchase the above-captioned property pursuant to a letter dated November 22, 1968 as amended by a letter dated November 27, 1968 you should be advised. * * *'
 
 
 38
 Upon learning of Holleb's November 27 and December 2 letters to the trustee, Shlensky on December 6 wrote the trustee that he reaffirmed his previous bid of $960,000, 'but I hereby waive any rights to the insurance claim proceeds and I agree that the proceeds of said uncollected fire loss (valued at $200,000 by the trustee and Holleb) shall remain the property of the Estate of H. R. Weissberg Corp. * * * The net effect of this proposal is to increase the benefit to the estate by the amount of the fire loss proceeds realized by the pending litigation, which as I have indicated the trustee and Holleb have valuded at $200,000 and therefore my proposal is in effect $1,160,000 insofar as the estate and the creditors thereof are concerned.' Shlensky also agreed to indemnify the estate against any secured claims asserted against either the personal property or real estate of the hotel.
 
 
 39
 Dunbar did not change its bid after November 22.
 
 
 40
 On December 17, 1968 another hearing was held before the district court. Prior to the hearing, both the S.E.C. and the Creditors' Protective Committee recommended acceptance of the Shlensky bid. At the hearing, counsel for the S.E.C. and the Protective Committee adhered to their recommendations. The trustee's attorney analyzed the bids in the light of the letters written to the trustee by Holleb and Shlensky subsequent to the November 22 hearing. The trustee also addressed the court as did Holleb and counsel for Shlensky. At the conclusion of the hearing the judge announced that he approved the Holleb bid and directed the trustee's attorney to draft an order in accordance with his decision.
 
 
 41
 In his 'memorandum decision' and order entered January 15, 1968 confirming the sale of the hotel to Holleb, the district judge made a number of findings or subsidiary determinations. One is particularly important; it reads in part:
 
 
 42
 The designation by the Trustee in this regard of the 5:00 P.M. hearing on November 22, 1968, as being the final time and date of submission of bids should and does control herein. The SHLENSKY bid as made at 5:00 P.M. on November 22, 1968, is less than the HOLLEB bid of that date, considering the evaluation of the insurance claim at $200,000.00, as reserved by HOLLEB in his bid on that date. The undertaking of December 2, 1968, of HOLLEB, in which he agrees to pay the insurance adjuster, is merely a clarification of the insurance claim net evaluation, and the undertaking with respect to the claims secured by hotel furnishings merely reiterates the HOLLEB agreement stated in open court on October 9, 1968, the first hearing on return of bids. The HOLLEB bid, as of November 22, 1968, amounts to $1,000,000.00 for the equity in the property inclusive of the insurance claim and provides indemnity to the estate as against all of the secured claims. The SHLENSKY bid of that date is $960,000.00 for the equity and the insurance claim, but does not provide indemnity against the secured claimants. Such additional bid as made by SHLENSKY after the close of bidding on November 22, 1968, the Court finds that under the circumstances should not be considered for the reasons assigned above. The Court also finds that the value being placed on the insurance claim by SHLENSKY is purely speculative in the hands of the Trustee, and that SHLENSKY has not offered to pay for same on the HOLLEB basis.
 
 
 43
 It is apparent from the above quoted language that the judge determined in effect that the Holleb bid on November 22 included the amount of $200,000 representing the value of the fire loss claim. But an analysis of Holleb's original bid together with his subsequent letters demonstrates that this is not the fact. Holleb's bid on November 22 included no specific amount for the insurance claim. Instead, it provided in terms for the payment of $800,000 in cash 'plus the assignment of insurance proceeds of a previous fire loss or at the option of the trustee, an amount equal to the value of such fire loss as agreed upon between the trustee and the buyer.' Even Holleb himself in his December 2 letter considered the $200,000 offer for the fire loss claim an 'amended' bid. Although the judge afforded Holleb's December 2 bid nunc tunc treatment, he refused to treat Shlensky's amended December 6 bid on the same terms. In effect he ruled that November 22 was the final bidding date for Shlensky while at the same time he permitted Holleb to subsequently amend his bid. The judge had no warrant for such unequal treatment of the competing bidders. His ruling was wholly inequitable and irregular; it had no lawful basis in light of the facts before him.
 
 
 44
 If we look at the proceedings and events between October 9 and December 17 in their entirety, the inescapable conclusion in that no guidelines were prescribed by the district judge as to the content of the bids which were to be submitted, the procedure for such submission, and most importantly when the bids were to be considered final.[1] The sale was neither public nor private but an improvisation.
 
 
 45
 An additional irregularity was the district judge's consideration of the ultimate use the bidders intended for the property. In the first place, this intention was requested of the bidders by the trustee at the judge's direction on December 11, long after the date the court ruled as the final date for bids. Thus the request was a complete afterthought. But more important, the property's ultimate use was not an appropriate matter for the court's consideration. Holleb's statement with regard to his plans to develop the property in no way bound him and of course could not be accomplished without approval of the city's building department and zoning board. If we take the judge's statements at face value, he permitted this extraneous and improper consideration to influence his decision.[2]
 
 
 46
 In sum, I believe that the procedure followed by the district judge in this bankruptcy sale was so haphazard and fraught with irregularities and aggravated unfairness as to amount to a gross abuse of discretion. I would remand and order a new sale to be conducted.
 
 ON PETITIONS FOR REHEARING[1]
 
 47
 PER CURIAM.
 
 
 48
 Appellants Rosenthal and Dunbar point out that we were in error in stating that 'they do not assert that their free and clear bid, made November 22, was highest and best'. They did so assert in their reply brief.
 
 
 49
 We conclude, however, in the absence of any concession, that their bid was not highest and best.
 
 
 50
 Their bid, as revised November 22, was $8,150,000 for the property, free and clear of encumbrances. Because of delay in payment (for four years, and without interest) of the portion which would represent the trustee's equity, evaluation required computation of the present worth of such portion. The Securities and Exchange Commission computed present worth at $877,329. With respect to price, this was lower than the Shlensky bids, either November 22 or December 6, lower than the Holleb bid of $800,000 for the equity plus $200,000 for the insurance claim, and lower than the Holleb alternative of $800,000 for the equity, with the trustee retaining the insurance claim, if one assigns to the insurance claim a liquidation figure of $78,000 or more.
 
 
 51
 With respect to the indemnity feature of the bids for the equity, the Rosenthal-Dunbar bid would be as good as the Holleb bid under either alternative, and as the Shlensky December 6 bid.
 
 
 52
 The Rosenthal-Dunbar bid presented contingencies which were not involved in the other bids. The commission pointed out to the district court: 'Among these contingencies is the willingness of the mortgagees to give partial releases to their security, the maintenance of the estate in Chapter X for at least four more years, and the costs of administration during this time'.
 
 
 53
 In addition, Rosenthal and Dunbar, shortly before the hearing on November 22, delivered to the trustee a 'real estate contract' executed on behalf of the buyer. It is referred to in the letter which contains their revised bid of November 22 as a 'suggested contract form'. Although the status of this document, anent the bid, was somewhat equivocal, it did contain a provision for termination of the contract at the election of the purchaser if the city failed to approve a planned development under certain provisions of the zoning ordinance.
 
 
 54
 Under the circumstances the Rosenthan-Dunbar bid was not the highest and best.
 
 
 55
 We find no merit in other propositions advanced by both appellants, and the petitions for rehearing are denied.
 
 
 56
 Circuit Judge SWYGERT adheres to his dissenting opinion filed herein and votes to grant the petitions for rehearing.
 
 
 
 [1]
 In re Webcor, Inc. (7th Cir., 1968), 392 F.2d 893, 898
 
 
 [2]
 Graffam v. Burgess (1886), 117 U.S. 180, 191, 6 S.Ct. 686, 692, 29 L.Ed. 839, 842-843
 
 
 [3]
 Id
 
 
 [4]
 Shipe v. Consumers' Service (7th Cir., 1928), 29 F.2d 321; Reid v. King (4th Cir., 1946), 157 F.2d 868
 
 
 [5]
 In re Prairie Coal Co. (E.D.Ill., 1941), 40 F.Supp. 894
 
 
 [1]
 This fact was brought to the attention of the district judge at the December 17 hearing. The attorney representing the S.E.C. made the following comment:
 Now, I don't say that there was anything wrong with the provision that he put in the bid, but the very fact that there was the option whereby he could agree with the trustee as to the value of the fire loss did not permit the Holleb offer to be amended after all of the others had been received, which is exactly what was done.
 The attorney for the debtor commented:
 I would suggest to your Honor that though no fault of the Court or of the trustee or, for that matter, of the debtor and perhaps by the design of the bidders, the rules have become a little bit fuzzy so that we are not clear at this point just what the rules of the game are.
 I know your Honor has expressed a reluctance before to have bidding in open court, but it appears to me that we should not be bidding apples against oranges here, that we should be bidding apples against apples, that we should set up ground rules here and now.
 Even the trustee recognized that the procedure lacked guidelines. He stated:
 I ask your Honor to reconsider and if these bids are to be reopened, let's have some dignified and honorable ground rules whereby the position of your trustee will have some standing in this building.
 
 
 [2]
 In the course deciding to accept Holleb's bid the district judge commented:
 I considered the bids relatively the same. It was with this in mind, when after conferring with the Trustee, the Trustee's attorney, and the attorney in charge from the Securities & Exchange Commission, I asked to be supplied by each of the bidders with some additional information. This additional information was most important to me because I am not only working with the problem of an estate, the Weissberg estate, as that Weissberg estate extends across the whole of the country from Baltimore, Maryland to New Orleans, from the Lord Baltimore Hotel to the Fountainbleau, to Palm Beach, Florida and on up back to Chicago, but I am concerned with the fact that this Court is a part of the Northern District of Illinois which is also the fatherland, so to speak, or the motherland, of Chicago. I am concerned with what is going on and what is going to happen as a result of my rulings and my determinations in this case to a great city. You may make a ruling in one case that can affect the happiness of thousands of people in a certain area of the city, that will affect the tranquility of the entire city, and rulings of courts in equity are not confined to just the facts before them. They are to be expanded to include the over-all concepts of decency and wisdom and equity as they affect all of the people. This is why bankruptcy courts, courts in Chapter X's and Chapter XI's, have plenary jurisdiction.
 It isn't always that a dollar more here will bring a better outcome for the estate, or a dollar less here will bring a better outcome for the city.
 But in looking at the problem before me I wanted to be able to measure what will be the effect upon the whole of this estate, not just the very poor people and hardworkers who lost their jobs who worked out at the Edgewater Beach, but some of those hardworkers who have been laid off at the Emerson in Baltimore, Maryland; they are as interested in what happens at the Edgewater Beach as are the people who work for the Edgewater Beach, and the people who gave credit to the management in Palm Beach, Florida, they are just as interested in what happens to the Palm Beach as those who have credit to the Palm Beach-- I mean, to the Edgewater Beach Hotel. So I asked Mr. Gesas to ask as quickly as possible each of the bidders to write me, send a copy of the letter to Mr. Windel and one to Mr. Gesas, and tell me 'What is your ultimate use? What are your plans? How do you plan to go about using this? Over what period of time will it take to implement your program?' And then, 'How can you demonstrate your financial capability,' not only of paying us but carrying through on their program. I got one letter. I am concerned because I have the greatest respect for Mr. Shlensky, and I did not know that his brother had died until just yesterday. I have known them for years and years. He did not have a chance. I believe he would have had he had a chance, have answered that letter. He would have let me know. I am satisfied with the program that has been suggested in the Holleb report, which I have had on my desk for several days, and opened just before I came in. This is not just to be another one of those slick, narrow, square, high-rise flamboyant, sky-breaker batches of structural steel and cement and glass that desecrate the beauty of the landscape as you go north on Sheridan Road. What he had in mind will carry over many years of construction, in fact, they do not contemplate completion within three to four years. It involves a magnificent housing development very much akin to what has been done with the Sandburg Village-- I believe Sandburg Village was named-- and South Commons, the Juneau Village, with Shopping centers, off-street parking and lower level structures, some superstructures, high superstructures with a minimum of demolition as they progress so that there will be maximum availability for use by Loyola University of the center structure until it will be the last one to be replaced. Well, this fits closer into the dream that I had for Chicago, Mr. Holleb, I will tell you the truth, this fits closer into the dream that I had for Chicago, knowing that the maximum use out there could not be another hotel, than what I thought you had. What I thought you had in mind was just another bunch of row houses, as I call them, row house 40-story apartment houses. If this is going to be something as you describe it, that will take its place in the place of the Edgewater Beach and lend to the beauty of the skyline what the Beach has given it over these many years, this I like. I have nothing else to go upon. Your bid gives out tomorrow.
 
 
 [1]
 An order has been entered by the full court denying suggestions for a rehearing in banc. Circuit Judge Swygert voted to grant rehearing in banc