[Civil No. 1088.   Filed March 20, 1909.]

[100 Pac. 1094.]

ALBERT STEINFELD and the SILVER BELL COPPER
    COMPANY, a Corporation, Defendants and Appellants,
    v. MARY NIELSEN, Administratrix of the Estate of
    CARL S. NIELSEN, Deceased, and MARY NIELSEN,
    in Her Own Personal Right, Plaintiff and Appellee.

1. CORPORATIONS—FRAUDULENT TRANSACTIONS—FIDUCIARY RELATIONS.
    A person, who is neither an officer nor a director of a corpora-
    tion, but who controls its affairs as a majority stockholder, through
    a board of directors, sustains to the corporation and stockholders
    the fiduciary relation occupied by an officer or director.

2. SAME—SAME—SAME.—An officer or director of a corporation, who
    seeks to purchase the stock of a stockholder, must disclose to the
    latter facts which have come to him by virtue of his relation to
    the corporation, and not known to the stockholder, or which may
    not be readily ascertained by the stockholder, and must disclose

such plans as the corporation may have for the future which have a bearing on the value of the stock.

3. SAME—SAME—SAME.—An individual controlled a mining corporation by controlling a majority of the stock and two of the directors. He closed down the mine, when it was operated at a profit, for the purposes of purchasing other mines and of securing the stock held by the manager of the corporation, whom he caused to be discharged. He falsely represented to the manager that the indebtedness of the corporation was not being materially reduced, and failed to disclose his purposes. He knew of the manager's financial condition, and induced him to sell his stock at an alleged inadequate price, stating that the manager would get nothing for his stock unless he sold for the price offered. It was not found that the manager did not know that the individual intended to acquire other property, but it was found that the individual did not disclose the facts. *Held,* that in view of the presumption that the manager of a corporation must be as familiar with its affairs and property as any other member of the corporation, and must be familiar with the plans of the corporation for the future, the individual violated no duty which he owed to the manager, either by misrepresentations or concealments, depriving the manager of the right to set aside the sale on the ground of fraud.

4. SALES—FRAUD—INADEQUACY OF PRICE.—To determine, in a suit to set aside a sale on the ground of the buyer's fraud, whether the price is so grossly inadequate as to amount in itself to conclusive evidence of fraud, the court must look at the facts as they existed at the time of the contract of sale, and not at the time the price was actually paid, and the inadequacy must be so gross as to furnish a strong presumption that an undue advantage has been taken of the ignorance, weakness, distress, or necessity of the seller.

APPEAL from a judgment of the District Court of the First Judicial District, in and for County of Pima. John H. Campbell, Judge. Reversed and remanded.

STATEMENT OF FACTS BY COURT.

This action was brought against the appellants in the district court of Pima county in June, 1905, by the appellee, Mary Nielsen, individually, and as the administratrix of the estate of Carl S. Nielsen, deceased. Among other things, the complaint prays that a certain sale, made by Carl S. Nielsen and Mary Nielsen to Albert Steinfeld, of three hundred shares of the capital stock of the defendant corporation, should be set aside as fraudulent, and the plaintiff have judgment for said stock, and for $33,000 dividend theretofore paid thereon

and received by said Steinfeld. Judgment was rendered in the lower court decreeing the plaintiff to be the owner of the said stock, and that she recover from Steinfeld the amount of the dividend, less the amount of the purchase price paid by Steinfeld. From the judgment an appeal was taken to this court.

The court found the facts as follows:

"This cause came on regularly for trial in the above-entitled court, before Hon. John H. Campbell, judge thereof, presiding, sitting without a jury, a jury having been theretofore regularly waived by all the parties, on the thirtieth day of March, 1908, all of the parties being present in person, and also by their attorneys, evidence, oral and documentary, having been regularly introduced and offered by the respective parties, and received by the court, and submitted to it for its decision. After due consideration of the pleadings and all the evidence admitted in the case, and being fully advised in the premises, the court finds the following to be the facts in the case:

" (1) That the plaintiff, Mary Nielsen, is the widow of the late Carl S. Nielsen, who died intestate on or about the fifth day of March, 1901, in Pima county, Arizona Territory, leaving as his sole heirs at law, his said widow, Mary Nielsen, and their four children, Hilda S., Guynne E., Ian W., and Richard H. Nielsen, then aged thirteen, eleven, nine and seven years, respectively, that on the fifth day of June, 1903, the probate court of said Pima county granted letters of administration on the estate of the said Carl S. Nielsen, and said Mary Nielsen was by the said court duly and legally appointed administratrix of his estate, and duly qualified as such, and since said fifth day of June, 1903, the said Mary Nielsen has been, and now is, the duly qualified and acting administratrix of the estate of the said Carl S. Nielsen, and that the said Carl S. Nielsen in his lifetime was a citizen and resident of the county of Pima, territory of Arizona.

" (2) That the defendant Albert·Steinfeld is a citizen and resident of the county of Pima, territory óf Arizona, and resides in the city of Tucson; that the defendant the Silver Bell Copper Company is a corporation duly organized and existing under the laws of the territory of Arizona; that said corporation was organized on the fourteenth day of January,

1899, under the name of the Nielsen Mining and Smelting Company; and that, by resolution of the board of directors, made on or about the fourteenth day of January, 1901, its name was changed to the Silver Bell Copper Company, and since that date, and up to the present time, the said corporation has conducted its business under and by the name of the Silver Bell Copper Company.

"(3) That about the end of the year 1897 said Carl S. Nielsen leased from Albert Steinfeld, as trustee for Julia Zeckendorf, the then unpatented mining claim, situated in the Silver Bell mining district of Pima county, Arizona, known and called the 'Old Boot Mine.' That said lease was oral and terminable at will. That under said lease the said Nielsen was to have the privilege of working said mine, and extracting and shipping and selling ores therefrom, on the payment to said Steinfeld, as such trustee, of a royalty of $1.25 per ton on all ore extracted and shipped or smelted by him, and the said Nielsen was to do the annual assessment work on said claims. That soon thereafter said Nielsen took charge of said mine, and proceeded to work the same under said lease, and extracted therefrom, and smelted at the smelter erected thereat, and shipped, large quantities of ores; and, during the time the said Nielsen was so operating, he obtained his supplies from Wheeler & Perry, who were engaged in the mercantile business in the city of Tucson, Arizona, and shipped the product of such mine through the bank. While Nielsen was so engaged in conducting his said business, one Hugo J. Donau, who was in the employ of L. Zeckendorf & Co., a firm composed of L. Zeckendorf and Albert Steinfeld, on behalf of said firm, proposed to said Nielsen that then and thereafter the products of said mine be shipped through the firm of L. Zeckendorf & Co., who would make advances and furnish supplies to be used in the working of said mines, the same to be paid for out of the product of said mine. Said proposition was agreed to and accepted by said Nielsen, and then and thereafter all the product of said mines was so shipped, and certain supplies were furnished him by said Zeckendorf & Co., and the proceeds of said product were collected by said firm and applied thereon. This agreement was not by its terms to extend for any specific time. That at the time the said Donau made said proposition he was in the

employ of, and acting on behalf of, said firm, and at such time said Albert Steinfeld was the managing partner of said firm and in charge of its affairs. That the prospect of said mine grew better as said Nielsen continued to work the same under said lease. That during the time said Nielsen operated said mine under said lease, and prior to the organization of the Nielsen Mining and Smelting Company, he developed large quantities of ore in said Old Boot mine, and erected and used a smelter for the treatment of the ores therefrom, and expended large sums of money in developing said mine, and in the erection of said smelter. That on the fourteenth day of January, 1899, the said Nielsen was indebted to the following persons, in the following sums, to wit:

| | | |
|---|---:|---:|
| L. Zeckendorf & Co. | $16,608 | 27 |
| L. Zeckendorf & Co. | 826 | 25 |
| Wheeler & Perry | 2,027 | 27 |
| C. T. Etchels | 110 | 00 |
| C. F. Schumacher | 160 | 00 |
| W. J. Corbett | 75 | 00 |
| Gardiner, Worthen & Goss | 438 | 85 |
| J. Dobson | 20 | 00 |
| Employees | 1,221 | 12 |
| Total | $22,886 | 86 |

"And the said Nielsen had on hand at the mine, property, and had in transit to market, products of said mine and smelter which were valued, by the said Nielsen and the said Curtis representing the firm of L. Zeckendorf & Co., and the said Steinfeld, at a sum slightly in excess of the debts owing by the said Nielsen, including all debts due by him to the said firm of L. Zeckendorf & Co.

"(4) That while the said Nielsen was operating said mine under said lease the said Albert Steinfeld procured J. N. Curtis to go out and examine the said mine, and after such examination the said Curtis proposed to the said Nielsen to organize a corporation to take charge of and operate said mine and smelter belonging to said Nielsen. That as a result of said proposal and the negotiations which followed it, the Nielsen Mining and Smelting Company was, on the fourteenth day of January, 1899, duly organized under the laws of the territory of Arizona. That the capital stock of said

company was $25,000, divided into one thousand shares of the par value of $25 each, which said stock was fully paid up and nonassessable. That the incorporators of said corporation were J. N. Curtis, R. K. Shelton, and C. S. Nielsen, and that upon the organization of said company the said J. N. Curtis, R. K. Shelton, and C. S. Nielsen became the sole directors thereof, and the said J. N. Curtis was elected president and treasurer of said company, the said R. K. Shelton was elected secretary of said company, and the said Nielsen was elected vice-president of the said company. That at the first meeting of the board of directors of said Nielsen Mining and Smelting Company, held January 14, 1899, the said Nielsen made a proposition to the company to sell to it his smelting plant on or near the Mammoth millsite, or Old Boot mine, all the machinery, tools and appliances, and' personal property owned and used by him in connection with said smelting plant, and also all leases and licenses to work said mines and mining claims in the Silver Bell mining district which he then had, in consideration of the corporation issuing to him nine hundred and ninety-seven shares of its capital stock, full paid and nonassessable, and also upon the company assuming and paying an indebtedness to various persons, a list of which he presented, and which is the list set out in finding 3, which said indebtedness was secured by copper bullion in transit to market through the firm of L. Zeckendorf & Co., and in which he agreed to assign to the company his equity. That the said proposition was duly accepted by the corporation, and the said Nielsen duly transferred to the corporation the property mentioned in his offer, and received a certificate to the effect that he was entitled to receive therefor nine hundred and ninety-seven shares of the capital stock of said corporation. That the president reported a list of debts assumed by the said corporation, which said list is set out in finding 3, amounting to $22,886.86, and reported that the said sum of the indebtedness was secured by large shipments of copper bullion in transit. That by motion duly made the board of directors of said corporation agreed to accept the report of the president concerning said proposal by the said Nielsen and its acceptance by the president, and his actions in the premises were ratified and confirmed. It was also resolved by the board of directors that the corporation take immediate charge

and control of the smelting plant and property purchased, and that it continue the mining operations thereat. On motion it was unanimously agreed that Carl S. Nielsen be elected superintendent, and act as such for a period of one year, and Mr. Nielsen accepted the position.

"(5) That after the organization of said company it was agreed that the stock of said corporation should be issued as follows: Five hundred shares to L. Zeckendorf & Co., a partnership composed of Albert Steinfield and Louis Zeckendorf, and a certificate of four hundred and ninety-nine shares was issued to said L. Zeckendorf & Co., and one share was issued to said Shelton; one hundred and seventy shares to J. N. Curtis; thirty shares to Albert Steinfeld as trustee for Julia Zeckendorf; three hundred shares to Carl S. Nielsen.

"And certificates of stock were duly issued to the parties named above for the amounts above stated. That immediately after the said Nielsen was elected superintendent, he took charge of the property of the corporation, and, subject to the control of the said Curtis, who as president of said corporation had general control thereof, conducted the mining and smelting operations of the company for about one year, and during the time he so operated said mine large quantities of valuable ores were extracted therefrom, smelted, and the product thereof shipped to market through the firm of L. Zeckendorf & Co., of which the said Steinfeld was the managing partner, and other bodies of ore developed. That after the organization of said corporation all the products of the mine and smelter were turned over to L. Zeckendorf & Co., and all moneys, goods, and supplies were obtained from the said firm of L. Zeckendorf & Co. That during this time Albert Steinfeld was the active and managing partner of L. Zeckendorf & Co., and as such had absolute control over the credit extended by said firm to the Nielsen Mining and Smelting Company, and as a member of said firm he managed, controlled, and voted the stock owned by said firm in said corporation, and by means of the stock owned by said firm, and the stock held by him as trustee for Julia Zeckendorf, he controlled a majority of the stock of said Nielsen Mining and Smelting Company, and though neither an officer nor director of said company, he dominated and controlled the same. The share of stock standing in the name of R. K.

Shelton belonged to, and was the property of, L. Zeckendorf & Co., and the said Shelton was but the representative of that firm upon the board of directors of said corporation, and was dominated and controlled by the said Albert Steinfeld. J. N. Curtis was an employee of the said firm of L. Zeckendorf & Co., and, because of the business relations existing between the said Steinfeld and the said Curtis the said Curtis was largely influenced in his actions as a director of said corporation by the said Steinfeld. That the power of the said Albert Steinfeld over the Nielsen Mining and Smelting Company, and over the directors and officers thereof up to the purchase of the stock of C. S. Nielsen therein, on June 29, 1900, arose out of, and was because of, the fact that the said company was largely in debt to L. Zeckendorf & Co., and that L. Zeckendorf & Co., and the said Steinfeld, as trustee for William and Julia Zeckendorf, held a majority of the said stock of said company, and said Steinfeld, as the manager of said firm of L. Zeckendorf & Co., having the power to control said indebtedness and to-vote the stock of said L. Zeckendorf & Co., and as trustee for William and Julia Zeckendorf, having the power to vote their stock, and because of the fact that the said J. N. Curtis and R. K. Shelton were employees of the firm of L. Zeckendorf & Co., and under the direction and control of said Steinfeld, and because of the fact that the said Nielsen had all of his means tied up in the said company, and was without means to secure the necessary supplies and advances to operate said mine and smelter, and because all of the product of said mine and smelter was turned over to the firm of L. Zeckendorf & Co., who determined the disposition thereof, and which firm collected all the proceeds thereof. And that the said Albert Steinfeld, as managing partner of L. Zeckendorf & Co., had the power to determine whether at any time further credit should be extended to said company, and had the power and legal right at any time to cease extending credit to the said company. That the said firm of L. Zeckendorf & Co. was under no obligation at any time to extend any further credit to the said corporation, and had the legal right at any time to cease giving further credit, and to enforce the collection of the amount owing to said L. Zeckendorf & Co. by said corporation.

"(6) That during the year 1899, large amounts of money were expended in developing and working said mine, and in the purchase and erection of machinery, building, and other improvements on said mine and smelter, and thereby substantial quantities of valuable ore were discovered and developed therein, and the value of said mine was substantially increased thereby. That shortly after the organization of said corporation, an option was granted by Albert Steinfeld, as trustee for William and Julia Zeckendorf, to the said company, giving the said company the right to purchase the Old Boot mine for the sum of $25,000, payable in quarterly payments of $2,500 each, and providing that, in the event of failure to make payment of each such installment at the time it became due, the said option and right thereunder should be forfeited. And that at the time of the shutting down of said smelter, and the discharge of said Nielsen as superintendent, as hereinafter stated, there was still unpaid on said purchase price the sum of $15,000. Said last-mentioned sum was, after July 1, 1900, paid by said company, and said mines thereby became the property of said company, and was owned by it at the time of the sale thereof to the Imperial Copper Company. That during the months of October, November, and December, 1899, and January, 1900, the smelter of the company was in active operation, and was producing copper at a material and considerable profit, and the sale of the product of said smelter was materially reducing the debt owed by said company to the firm of L. Zeckendorf & Co. The exact amount of profit during the time is not shown by the evidence.

"(7) That sometime in the year 1899 the said Steinfeld determined to get rid of Nielsen as a stockholder in said company, and on January 3, 1900, the said Steinfeld wrote the following letter to Nielsen: 'Mr. C. S. Nielsen, Red Rock, Ariz. Dear Sir: In view of the very large indebtedness existing against the company, and the fact that little headway is being made toward its liquidation, I have decided after careful consideration to close down both mine and smelter when the present coke supply is exhausted, which would be about the 15th or 20th inst. You will please make all provision to this end incurring no larger outlay than is absolutely necessary for such articles as wood, ore and other supplies

except what would be required for the purposes stated. The present good showing in the mine may place us in a position to sell the property at an advantageous price and this will be my aim to do at the very earliest possible moment. It will also be wise for you to advise George that no credits be extended to anyone beyond what can be collected during the time contemplated, and that every effort be made to collect all outstandings pending to date. Yours truly, Albert Steinfeld.' That at and prior to the time the said Steinfeld wrote said letter the said mine and smelter of said company were running at a considerable profit, and the debt due from said company to the firm of L. Zeckendorf & Co. was being substantially and continually reduced, and that these facts were known to the said Steinfeld at the time he wrote and sent said letter to Nielsen. That at the time he wrote said letter the said Steinfeld had made up his mind to shut down said mine and smelter for the purpose of acquiring the interest of Nielsen in said corporation, and for the purpose of acquiring a certain adjoining group of mines known as, and hereinafter referred to as, the 'English Claims' before proceeding with the further development of the Old Boot mine, and wrote said letter in pursuance of his said purpose. That the said English group of mines adjoined the said Old Boot mine, and, if acquired for the corporation, would greatly add to the value of the stock held by the said Nielsen in said corporation, all of which was known to said Steinfeld. That at the time the said Steinfeld wrote the said letter dated January 3, 1900, and at the time of the discharge of the said Nielsen as superintendent, as hereinafter found, and at the time Steinfeld acquired the stock held by the said Nielsen, as hereinafter found, the said Steinfeld intended and expected that the said corporation would acquire the said English group of mines, but did not disclose said fact to the said Nielsen. That on or about the first day of February, 1900, the said Steinfeld, although he was neither a director nor officer of said company, undertook to discharge said Nielsen from his position as superintendent of said company, and the said Nielsen refused to be discharged by the said Steinfeld. That at the time said Steinfeld undertook to discharge said Nielsen he had not been authorized by the board of directors to do so, and had not consulted with the said board, and

the said board had not in any way authorized anyone to discharge the said Nielsen as such superintendent. That subsequently the directors Curtis and Shelton, for the purpose of making it appear from the records of the corporation that said Steinfeld had authority to discharge the said Nielsen, caused to be entered upon the corporate minutes of said company, as of the date of February 1, 1900, the following resolution: 'On motion duly seconded it was resolved that C. S. Nielsen be and he hereby is discharged as superintendent of this corporation, and his salary as such be discontinued from this date.' Whereas, in truth and in fact the said resolution was not put upon the minutes, and no meeting was held on February 1, 1900, and not until some days thereafter, on or about the tenth day of March, 1900. And that thereafter, on or about the tenth day of March, 1900, the directors of the said corporation, at a meeting at which J. N. Curtis and R. K. Shelton only were present, but of which meeting said Nielsen had notice, passed the following resolution: 'On motion duly seconded the action of the board of directors at its meeting held February 1, 1900, in discharging said C. S. Nielsen as its superintendent is ratified, approved and confirmed. On motion it was unanimously resolved that the said C. S. Nielsen be and he is hereby discharged as superintendent of the company.' That at the time above last-mentioned resolution of March 10, 1900, was passed, reciting the ratification of the action of the meeting of February 1, 1900, the said Curtis and the said Shelton well knew that no such meeting of the board of directors had been held on February 1, 1900. That on or about the nineteenth day of February, 1900, the said Nielsen, believing he had been regularly discharged as such superintendent by the board of directors, and believing the statements of said Steinfeld in his letter of January 3, 1900, and having all his means invested in said company, and the existing supply of coke then at the smelter being exhausted, and the said Nielsen being powerless to obtain supplies to run said mine and smelter, and all the assets of the said corporation being under the control of the said Steinfeld, did shut down the said mine and smelter, and cease to be in possession and control thereof.

"(8) That in January, 1900, said Steinfeld caused the development work on said mine to be stopped. The smelter,

however, was run until sometime in February, 1900, at which time all the coke and supplies necessary for the operation of the smelter, and substantially all of the ore which had been developed prior thereto, were exhausted; but, if the development work had not been stopped by the said Steinfeld, but had been continued during the operation of the said smelter, sufficient ore would have been developed to have kept the smelter continuously supplied. That the said Nielsen, at the time of the closing down of the smelter, knew the condition of the mine. That at the time said Steinfeld had such mine shut down, he was informed of the value of said Old Boot mine, and of the value of said adjoining properties thereto, and did not shut down said mine and smelter because of the very large indebtedness existing against said company, and the fact that little progress was being made toward its liquidation, or because it was running deeper and deeper in debt to said L. Zeckendorf & Co., or because the ore was exhausted, but shut down the same solely and exclusively for the purpose of getting rid of the said Nielsen as a stockholder in said corporation, and to acquire his said stock, and for the purpose of acquiring the English group of mines.

"(9) That after the mine and smelter of the said Nielsen Mining and Smelting Company had been closed down as aforesaid, the said Steinfeld called upon the said Carl S. Nielsen, and proposed to buy his stock in said company, and also all interest which the said Nielsen and one Lewis might have to the mines or mining claims situated in said Silver Bell mining district. That during the negotiations the said Steinfeld stated to the said Nielsen that, if he did not take the offer of the said Steinfeld, he would get nothing for his said stock. That at the time the said Steinfeld was negotiating with the said Nielsen, the said Nielsen was in financial distress, and was without means, and this fact was known to the said Steinfeld at the time. That such negotiations were had on or about the twenty-ninth day of June, 1900. That the said Nielsen and the said Lewis executed to the said Steinfeld a quitclaim deed to the said Clarence and Identical mining claims for a recited consideration of $2,000, and on the same day, and at the time of the execution of the said agreement hereinafter set forth, said Carl S. Nielsen and Mary Nielsen executed and delivered to the said Steinfeld a

bill of sale, by the terms of which they sold, assigned, and transferred unto the said Steinfeld the said three hundred shares of stock, and also signed and executed, upon the back of the certificate representing such stock, an assignment and transfer thereof to the said Steinfeld, and delivered said certificate, with such assignment and transfer indorsed thereon, to the said Steinfeld, and a contract was signed by Albert Steinfeld, Nielsen Mining and Smelting Company, by J. N. Curtis, president, Mary Nielsen, and Carl S. Nielsen, but was never acknowledged by said Steinfeld or by said Curtis as president on behalf of the Nielsen Mining and Smelting Company. That the said deed, transfer, and contract were prepared by S. M. Franklin, the attorney of the Nielsen Mining and Smelting Company, at the instance and upon the information furnished by the said Steinfeld, and was sent by Steinfeld to be signed and acknowledged before W. F. Cooper by Carl S. and Mary Nielsen. That upon the execution and delivery of said deed the said Steinfeld paid to Nielsen and to said Lewis the sum of $2,000 in cash as a consideration for said Clarence and Identical mining claims, which was equally divided between said Carl S. Nielsen and said Lewis, as the joint owners of said Clarence mine. That said contract is in the words and figures as follows, to wit:

" 'This agreement made the 29th day of June, 1900, between Albert Steinfeld and the Nielsen Mining & Smelting Company, a corporation organized and existing under the laws of the territory of Arizona, parties of the first part, and Carl S. Nielsen and Mary Nielsen, his wife, parties of the second part, witnesseth: That the parties of the first part, in consideration of the transfer by said Carl S. Nielsen to Albert Steinfeld of the three hundred shares of the capital stock of the Nielsen Mining & Smelting Company, and in consideration of the parties of the second part executing their deed of quitclaim and release of their interest in and to certain mining claims as fully appear from certain quitclaim deed executed by the parties of the said second part and one L. B. Lewis, to said Albert Steinfeld, and in further consideration of the sum of one dollar by the said parties of the second part in hand paid to the parties of the first part, receipt whereof is hereby acknowledged, do hereby agree that they will pay unto the parties of the second part the sum of ten

thousand dollars, lawful money of the United States, as soon as the Nielsen Mining & Smelting Company will consummate a sale of its mining properties which are situated in the Silver Bell mining district, Pima county, Arizona, such sum to be paid within thirty days after such sale is completed. Said parties of the first part further agree that in the event that the Nielsen Mining & Smelting Company should commence active operations that then and in that event the net profits which may arise to said company from its said working and .shipping and operating shall be applied first to the payment of the debts of said company, second after said debts are paid said net profits up to the amount of ten thousand dollars shall be paid to the party of the second part, and upon full payment of said sum of ten thousand dollars out of said profits the parties of the first part hereto shall be relieved from all obligations to pay said parties of the second part a like sum of ten thousand dollars, or any part thereof, in the event said company consummates or completes a sale of its property as hereinbefore agreed; that is to say in no event shall said parties of the second part be paid more than the sum of ten thousand dollars.

" 'In witness whereof the parties have hereunto placed their hands the day and year first above written. In triplicate.

" 'ALBERT STEINFELD.

" 'NIELSEN MINING & SMELTING CO.,

" 'By J. N. CURTIS, President.

" 'MARY NIELSEN.

" 'CARL S. NIELSEN.'

" 'Territory of Arizona,

" 'County of Pima—ss.

" 'Before me, William F. Cooper, a notary public in and for the county of Pima, territory of Arizona, on this day personally appeared Carl S. Nielsen and Mary Nielsen, wife of said Carl S. Nielsen, known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purpose and consideration therein expressed, and the said Mary Nielsen, wife of said Carl S. Nielsen, having been examined by me privily and apart from her husband, and having the same fully explained to her, she the said Mary Nielsen acknowledged said instrument to be her act and deed and declared

that she had willingly signed the same for the purpose and consideration therein expressed, and that she did not wish to retract it.

" 'Given under my hand and seal of office this 29th day of June, A. D. 1900.

" 'WILLIAM F. COOPER,

" 'Notary Public.

" 'My commission expires March 13, 1901.'

"(10) That at the time said Steinfeld entered into negotiations for the purchase of the stock of said Nielsen, and the interest of said Nielsen and said Lewis in said mining claims, and at the time he procured the said Nielsen to sign the said deed, and transfer said stock and enter into and sign the contract above set out, he did not inform the said Nielsen that he had shut down the mine and smelter of said Nielsen Mining and Smelting Company for the purpose of getting rid of the said Nielsen, and for the purpose of acquiring the English claims, and did not inform the said Nielsen that the said Steinfeld had no authority to do so when he attempted to discharge the said Nielsen, and did not inform the said Nielsen that the entry contained in said minute-book of the company was a false entry, purporting to have been made therein as a record of a meeting of the directors of said company held about the 1st of February, 1900, and did not inform him that no meeting of the directors was held on that day, and that the said minute-book contained a false record of such pretended meeting. That the said Nielsen at the time he signed said deed and executed said contract, and made the said transfer of the stock in the Nielsen Mining and Smelting Company, did not know that the said Steinfeld had shut down. said mine and smelter for the purpose of getting rid of Nielsen and acquiring his stock, and did not know that the said mine and smelter had been shut down, while the same was making money, in order to enable the said Steinfeld to acquire the title to the English group, and did not know that the said Steinfeld had no authority from the board of directors to discharge the said Nielsen, or that the record in the minute-book of the company showing his discharge by said board of directors on or about the first day of February, 1900, was false, and that no such meeting of the board of directors was ever in fact held, but the said Nielsen believed that he

had been legally and duly discharged, and that the said Steinfeld had shut down said mine and smelter for the reasons stated in his letter of January 3, 1900, and acted and relied on such belief. That the said Nielsen was in financial distress, and was without means to resist the will and direction of the said Steinfeld, and the said Steinfeld knew of the pecuniary condition of the said Nielsen. That the said contract of June 29, 1900, was not authorized by the board of directors of the Nielsen Mining and Smelting Company, and that said Curtis signed the same on the part of the company without any authority of the board of directors of said company, at the instance and request of said Steinfeld. That upon acquiring the said three hundred shares of stock as aforesaid the said Steinfeld surrendered the certificate standing in the name of Carl S. Nielsen, and there was issued in lieu thereof a certificate for three hundred shares in the name of 'Albert Steinfeld, Trustee,' and said shares have since remained, and now stand on the books of said corporation, in the name of 'Albert Steinfeld, Trustee.' That neither the said Steinfeld nor the said Curtis made any false representations to the said Carl S. Nielsen or Mary Nielsen, or either of them, with reference to the amount of the indebtedness of the Nielsen Mining and Smelting Company to L. Zeckendorf & Co., but said Carl S. Nielsen and Mary Nielsen had at all times the means of ascertaining the amount of the indebtedness of said corporation to L. Zeckendorf & Co., and could with reasonable effort have ascertained the same, and in all the transactions herein set forth neither the said Carl S. Nielsen nor Mary Nielsen relied on any such representations.

" (11) That the English group of mines were acquired by the said Steinfeld, and were, in May, 1903, together with the said Old Boot mine, sold for the sum of $515,000, and the entire proceeds of the sale became the property of the Silver Bell Copper Company. That on or about the twentieth day of January, 1904, the board of directors of the Silver Bell Copper Company declared a dividend of $111 per share on the capital stock of said company, and the said Albert Steinfeld received from the said Silver Bell Copper Company the sum of $33,300 as dividends on the three hundred shares of stock which he had obtained from the said Carl S. Nielsen, as above set forth. That the said Steinfeld has kept and re-

tained the said sum of $33,300, and claims the same as his own. That on the twenty-third day of January, 1904, the said Steinfeld paid to the said Mary Nielsen the sum of $10,000, and received from the said Mary Nielsen a receipt therefor, which said receipt is in the words and figures following, to wit:

" 'Tucson, Arizona, January 23, 1904.

" 'Received from Albert Steinfeld the sum of ten thousand dollars ($10,000.00), the same being in full of all claims against Albert Steinfeld and the Nielsen Mining and Smelting Company or the Silver Bell Copper Company, or any or either of them, for all claims or demands which Carl S. Nielsen or Mary Nielsen have or had against the said Steinfeld and the said companies or both or any or either of them, of all kinds or character whatsoever; and I do hereby individually and as administratrix of the estate of Carl S. Nielsen, deceased, release the said Albert Steinfeld and the said Silver Bell Copper Company and the said Nielsen Mining & Smelting Company from any and all claim whatsoever which I have in either of such capacities against them or either of them.

(Signed) " 'MARY NIELSEN.

° " 'MARY NIELSEN,

" 'Adm'x of Carl S. Nielsen.

"Witness: 'T. L. CULIN.

" 'JOSEPH SEVERANCE.'

"That at the time said Steinfeld so paid said sum of money to the said Mary Nielsen he did not inform her of the price at which the property of the Silver Bell Copper Company had been sold to the Imperial Copper Company, nor any of the terms of payment, or of any details thereof. That he did not inform her, and she did not know, that the said Silver Bell Copper Company had declared a dividend of $111 per share on its capital stock, and did not inform her that he, the said Steinfeld, had received, and then had in his possession, the sum of $33,300 as dividends on the three hundred shares of stock which he had obtained from the said Carl S. Nielsen, as aforesaid. That the contract for the payment of the sum of $10,000 at the times and under the conditions provided in said contract was not an adequate consideration for the three hundred shares of stock, and that the said Steinfeld

knew, at the time he obtained the execution of said contract and the transfer of said stock, that the said contract was not a fair consideration for said stock, and at the time the said Steinfeld paid the said sum of $10,000 to the said Mary Nielsen the said sum was not a fair value of said stock, but that the same was a grossly inadequate price for the said stock, all of which the said Steinfeld knew.

"(12) That said Carl S. Nielsen died on the sixth day of March, 1901, and without having learned of the facts hereinbefore found as to the reasons or any of them for said Steinfeld's causing the said smelter and mine to be shut down, which impelled the said Steinfeld to cause said smelter and mines to be shut down, and without knowledge of the reasons which influenced the said Steinfeld in acquiring the said three hundred shares of stock.

"(13) That at the time the said Mary Nielsen received the said sum of $10,000 and executed and delivered said receipt and release, she did not know that the representations in said letter of Steinfeld of January 3, 1900, were false; and did not know that at the time said Steinfeld wrote said letter he had resolved to shut down said mine and smelter for the purpose of acquiring the English claims, and for the purpose of getting rid of the Nielsens and acquiring the stock of the said Nielsens; and did not know that the said Nielsen had not been discharged by the board of directors on or about February 1, 1900; and did not know that a false statement had been caused to be entered in the minute-book showing a meeting of the board of directors and the passage of a resolution discharging the said Nielsen as superintendent; and did not know the amount of the proceeds of the sale of the property which had been received by the Silver Bell Copper Company; and did not know that any dividend had been declared on said stock; and did not know that the said Steinfeld, at the time he paid her said sum, had received the sum of $33,300 as dividends on said stock—and the said Steinfeld knew all of these things and did not disclose them to the said Mary Nielsen. And that the Mary Nielsen was ignorant of the facts above set out, and received the said sum of money, and executed and delivered the said receipt and release, believing that the agreement of June 29, 1900, was a

valid and binding contract, and that she and the estate of said Carl S. Nielsen were bound thereby, and the said plaintiff did not discover what the truth in relation to said matters set out in this finding was until within less than one year before the bringing of this action."

Eugene S. Ives, and S. L. Pattee, for Appellants.

Steinfeld was not trustee for the Nielsens, and the relations between them were not of a fiduciary character. "A director of the corporation itself may buy and sell its stock like any other individual. The information which he has of the affairs of the corporation, whereby he is enabled to buy or sell at an advantage over the person with whom he deals, does not affect the validity of the transaction. He is entitled to the benefit of his facilities for information. There is no confidential relation between him and a stockholder, so far as a sale of the stock between them is concerned; and, so long as he remains silent and does not actively mislead the person with whom he deals, the transaction cannot be set aside for fraud." Cook on Corporations, 5th ed., secs. 320, 707; *Crowell* v. *Jackson,* 53 N. J. L. 656, 23 Atl. 426; *Rothschild* v. *Memphis & Charleston R. R. Co.,* 113 Fed. 476, 51 C. C. A. 310; *Haarstick* v. *Fox,* 9 Utah, 110, 33 Pac. 251. The facts found by the court in conjunction with the allegations of the complaint are insufficient to support the judgment. When the court makes findings and fails to find upon any material fact at issue, the fact is presumed to be found against the party upon whom was the burden of proof to establish it. *Lemster* v. *Warner,* 137 Ind. 79, 36 N. E. 900; *Western Union Tel. Co.* v. *Brown,* 108 Ind. 538, 8 N. E. 171; *Bruner* v. *Brown,* 139 Ind. 600, 38 N. E. 318. The shutting down of the mine by Steinfeld with the intent thereby to induce Nielsen by reason of his financial necessities and the financial condition of the mine to sell his stock is not such fraud as would render the sale of the stock voidable. If the facts found should be deemed to constitute that quality of fraud sufficient to authorize the rescission, then the cause of action growing out of such facts was barred by the statute of limitations.

G. W. Lewis, F. M. Hartman, W. H. Sawtelle, and Edwin F. Jones, for Appellee.

"Where the directors obtain information giving added value to the stock by virtue of his official position, he holds the information in trust for the benefit of those who placed him where this knowledge was obtained, in the well-formed expectation that the same should be used first for the company, and ultimately for those who were the real owners of the company." *Oliver* v. *Oliver,* 118 Ga. 362, 45 S. E. 232. "Because of the trust relation and the better opportunities for acquiring information, before any director or managing officer of a corporation having a knowledge of the condition of affairs of the corporation can rightfully purchase stock of one not actively engaged in the management of its affairs, such director or managing officer must inform the stockholder of the true condition of the corporation." *Stewart* v. *Harris,* 69 Kan. 498, 105 Am. St. Rep. 178, 77 Pac. 277, 2 Ann. Cas. 873, 66 L. R. A. 261; *Jones* v. *Electric Co.,* 144 Fed. 765, 75 C. C. A. 631; *Olney* v. *Conanicut Land Co.,* 16 R. I. 597, 27 Am. St. Rep. 767, 18 Atl. 181, 5 L. R. A. 361. If the director actively misleads a stockholder and buys his stock, then the transaction may be set aside for fraud. "Fraud in equity includes all willful or intentional omissions and concealments which involve a breach of either legal or equitable duty, trust or confidence and are injurious to another, or by which an undue or unconscientious advantage over another is obtained." 2 Pomeroy's Equity Jurisprudence, sec. 873, p. 1225. "When fraud is charged as is done in this case, express proof is not required; it may be inferred by strong presumptive circumstances." *McWilliams* v. *Cascade Fire & Marine Ins. Co.,* 7 Wash. 48, 34 Pac. 140; *Kempner* v. *Churchill et al.,* 8 Wall. 362, 19 L. Ed. 461.

DOAN, J.—It is contended by the appellants that the facts found do not constitute legal fraud, and that therefore the court erred in so finding, and in rendering judgment for the plaintiff and against the defendants, based thereon. Summarizing the facts upon which the court predicated fraud in the purchase of the shares of stock of Nielsen, these are: (1) That Steinfeld dominated and controlled the affairs of the Nielsen Mining and Smelting Company, or, as it was later

called, the Silver Bell Copper Company, through its board of .directors. (2) That the corporation being in debt to the firm of L. Zeckendorf & Co., which company was under Steinfeld's immediate control, and Steinfeld controlling a majority of the stock of the corporation, and two of the directors of the corporation being employees of the firm of L. Zeckendorf & Co., Steinfeld having the power to determine whether credits should at any time be extended to the corporation, and the legal right to enforce payment of the debt due from the corporation to L. Zeckendorf & Co., and using the power and authority he had, by reason of the foregoing facts, over the corporation, caused the closing down of the mine and smelter of the corporation in January, 1900, when the plant was producing at a substantial profit, and the corporation was thereby materially reducing its indebtedness. (3) That Steinfeld's purpose in causing the closing down of the mine and smelter at the time was (a) to enable him to purchase the property known as the English group of mines; (b) to get rid of Nielsen as manager and superintendent of the company; and (c) to enable him to purchase the stock held by Nielsen in the Silver Bell Copper Company. (4) That to effectuate these purposes Steinfeld, in his letter to Nielsen, falsely represented to Nielsen that the indebtedness was not at the time being materially reduced by the profits derived from the operation of the mine and smelter, when, as a matter of fact, the indebtedness was being materially reduced at the time, and failed to disclose his true purposes, and to state in said letter, or otherwise to inform him, that he had determined to shut down the mine and smelter for the purpose of acquiring the English group of claims and Nielsen's stock. (5) That in furtherance of his said purposes to obtain the English group of claims and Nielsen's stock he pretended to have Nielsen discharged as manager and superintendent. of the company, causing the minute-books of the company to be falsified, in that it was made to show that Nielsen's discharge was on the 1st of February, 1900, and not later, when the discharge was actually made. (6) That the circumstances did not justify the closing down of the mine at the time this was done, in that a sufficient supply of ore might have been developed if development work had not been stopped by the

XII Ariz.—26

order of Steinfeld in January, 1900. (7) That Steinfeld knew of Nielsen's financial condition, and that all his means were invested in the corporation, and, taking advantage of Nielsen's financial distress, known to Steinfeld at the time, Steinfeld, to induce the sale, said to Nielsen that if he did not take the offer of Steinfeld, he (Nielsen) would get nothing for his said stock.

Unless these facts constituted legal fraud, the judgment of the trial court cannot be sustained. To determine this question we must first establish the legal status of Steinfeld, at the time of the purchase of the stock in question, to the Silver Bell Copper Company, and what fiduciary relation, if any, he sustained by reason of such status to Nielsen, as a stockholder of the company. Steinfeld was neither an officer nor director of the corporation, yet, as found by the court, he dominated and controlled its affairs through the board of directors. Although we are not cited to any authority in point, we have no hesitation in holding that Steinfeld, because of his power over the board of directors and the affairs of the company, and the domination which the findings show he actually exerted over the corporation, sustained such a relation to the company, and to the stockholders of the company, as does an officer or director having such management and control, and that therefore he occupied such a fiduciary relation to the company and to the stockholders of the company as he would have sustained had he been such officer or director. Growing out of such relation, the question arises, what duty did Steinfeld owe to Nielsen to disclose his plans and purposes in causing the mine and smelter to be closed down, and in the second place his purpose to obtain the English group of mines? This is the essential inquiry, inasmuch as the findings do not show that there was any actual misrepresentation by Steinfeld to Nielsen as to any fact, or facts, which were not within the knowledge of Nielsen, or which might not have been readily ascertained by Nielsen by virtue of his position as manager and superintendent of the company. Undoubtedly, the law makes it the duty of an officer or director of a company, who is seeking to purchase from a stockholder the latter's holdings of stock, to disclose to the latter facts which have come to him by virtue of his relations to the company, and not known to the stockholder, or which

may not be readily ascertained by the stockholder, and to disclose such plans and purposes as the corporation may have for the future which have a bearing upon the value of the stock of the company; but the underlying principle upon which this duty rests is that the officer or director, being the agent of a corporation, and so in a sense the agent of a stockholder, may not take advantage of the knowledge which he thus acquires, and which every member of the corporation is entitled to know, in dealing with such stockholder. *Stewart* v. *Harris*, 69 Kan. 498, 105 Am. St. Rep. 178, 77 Pac. 277, 66 L. R. A. 261; *Oliver* v. *Oliver*, 118 Ga. 362, 45 S. E. 232.

The difficulty in applying that rule in this case is that Nielsen was himself an officer and director of the company, and, as such, presumptively informed of the condition of the mine, of its value and future prospects, and of the condition of its affairs. It is certaintly a fair presumption of fact that the manager and director of a mining corporation would be as familiar with the affairs of the company and with its property as any other member of the corporation. It may be true that Nielsen was misled by the statement of Steinfeld that the mine, at the time of its closing down, was not being operated at a material profit, but if he relied upon the statement, it does not appear that his means of ascertaining the true condition of the affairs of the company were not at hand and the truth readily ascertainable. Further, as director and manager of the company, it must be presumed that he was familiar with the plans of the corporation for the future working and development of the company's properties, and that, if the acquisition of other properties were essential to those plans, he must have known of it. The court does not find as a fact that Nielsen did not in fact know that Steinfeld intended and expected that the Silver Bell Copper Company would acquire the English group of mines, but the finding is that Steinfeld did not disclose said fact to Nielsen. If Nielsen did know of such plan and intent on the part of Steinfeld, or on the part of the corporation, certainly there was no duty—conceding that Steinfeld owed such a duty in the absence of such information on the part of Nielsen—to disclose such plan and intent to Nielsen. It is true that Steinfeld withheld from Nielsen any plan or intent on his part to get rid of Nielsen, either as manager and superintendent of the

company, or to purchase his stock at the time he closed or caused the closing down of the mine and smelter; but this plan or purpose in itself would not constitute fraud, unless it was accompanied by some actual representation or withholding of some fact not within the knowledge of Nielsen or readily ascertainable by him, which he was entitled to know.

Considering the facts in the light of the situation and the relation of the parties, we are unable to find wherein Steinfeld violated any duty which he owed to Nielsen, either in the way of misrepresenting any fact not within the knowledge of Nielsen, or presumptively readily ascertainable by him, which would reasonably have had an effect in bringing about the sale of the stock, or in failing to disclose any fact not known to Nielsen, or presumptively readily ascertainable by him, which he was entitled to know, which may have put him at a disadvantage in his dealings with Steinfeld. We do not consider the mere fact of Nielsen's financial distress at the time of the purchase as in itself constituting legal fraud, for in the absence of any misrepresentation or concealment of fact Steinfeld was in the position of any other purchaser in dealing with Nielsen, and violated no legal duty in purchasing the stock, no matter how great Nielsen's necessities may have been.

It is true that the court found that at the time Steinfeld paid the $10,000 for the stock this was a grossly inadequate price therefor. This, however, was more than three years after the contract of purchase had been entered into. The court does not find that at the time the contract was executed the price was grossly inadequate, but merely finds that the price agreed upon was not then an adequate consideration for the stock, and that Steinfeld knew that fact at the time. To determine whether the price agreed upon was so grossly inadequate, using the language of the supreme court of the United States in *Graffam* v. *Burgess*, 117 U. S. 180, 6 Sup. Ct. 686, 29 L. Ed. 839, "as to shock the conscience," and of "so gross a nature as to amount in itself to conclusive and decisive evidence of fraud," we must look to the facts as they existed at the time of the contract, and not at the time when the money was actually paid under the contract. It is not mere inadequacy of price that will void such a contract, but the inadequacy must be so great as in itself to furnish a

strong, if not a conclusive, presumption that an undue advantage has been taken of the ignorance, weakness, distress, or necessity of the vendor.   Kerr on Fraud and Mistake, 186; *Butler* v. *Haskell*, 4 Desaus. (S. C.) 651.   The court does not so find.   Indeed, considering the indebtedness of the Silver Bell Copper Company at the time, and the situation of the property as disclosed by the findings, no basis for such a finding is apparent.   In our judgment the findings do not support the legal conclusion made by the trial court that such fraud was perpetrated by Steinfeld in the purchase of the stock as to warrant the rescission of the contract, and the recovery of the stock and of the dividends which have been received by Steinfeld thereon.

For this reason the judgment of the trial court must be reversed, and the case remanded, with directions to the trial court to enter judgment for the defendants.

SLOAN and NAVE, JJ., concur.

KENT, C. J.—I dissent from the conclusion and the result reached by my associates in the foregoing opinion.   I think the judgment of the trial court was correct.