WILLIAM SHERRILL ET AL., APPELLEES, v. MARK M. COAD, APPELLANT.

FILED NOVEMBER 13, 1912. No. 16,760.

1. Sales: RESCISSION: RETURN OF PROPERTY. In order to entitle a vendee of a chattel to a rescission of the contract of purchase, he must allege and prove notice to the vendor of his election to rescind, and a return or an offer to return the property.

2. ———: FRAUD: MEASURE OF DAMAGES. In an action by a vendee for damages for a breach of warranty or fraudulent representations by the vendor as to the quality of personal property purchased, where there is no rescission of the contract, the measure of damages is the difference between the value of the property as it actually was and what would have been its value had it been as represented at the time the representation or warranty was made.

3. ———: RESCISSION: BREACH OF WARRANTY. "A sale of personal property with a warranty of its fitness for a prescribed use may be treated as a sale upon condition subsequent at the election of the purchaser, and in the event of a breach of the warranty the property may be restored and the sale rescinded." *Mundt v. Simpkins*, 81 Neb. 1.

4. Fraud: PLEADING. The petition examined and set out in the opinion, *held*, insufficient to entitle plaintiffs to recover under either of the rules above announced.

APPEAL from the district court for Dawes county: JAMES J. HARRINGTON, JUDGE. *Reversed.*

A.. W. Crites, W. J. Coad and W. H. Herdman, for appellant.

*Justin E. Porter, Andrew M. Morrissey, Allen G. Fisher* and *William P. Rooney,* contra.

FAWCETT, J.

From a judgment of the district court for Dawes county, in favor of the plaintiffs, for alleged damages by reason of the purchase of a stallion from defendant, defendant appeals.

The petition alleges that in April, 1907, plaintiffs purchased from defendant a certain stallion for the sum of $500, under an oral warranty that the horse was a fair, average foal-getter, defendant well knowing that plaintiffs proposed to stand the horse for breeding purposes; that plaintiffs had no knowledge as to the qualities of the horse in that regard, and relied upon defendant's representations and warranty; that upon a trial of the horse for an entire season, under proper care and handling in every respect, the horse proved to be utterly worthless as a breeder, and "has proved of no value whatever for the purpose purchased; that he is not and was not as warranted therein a foal-getter, and that he has proved of no value to the plaintiffs, to their damage in the sum of $500 in that regard." The petition then alleges that the time of one man was devoted to the care and handling of the horse; that the care, board, feed and nurture of the horse have been wholly lost, and that the fair and reasonable value thereof is the sum of $600. It is further alleged that plaintiffs' damages accrued through no fault or negligence of their own, but solely through the inherent defects in the horse and through his failure "to come up to the warranty aforesaid." The prayer is for judgment for $1,100,

"their damages as aforesaid," with interest on $500 from April 30, 1907, and on $600 from June 12, 1908. The answer is: First, a plea to the jurisdiction, which need not be considered here; second, it admits the sale and delivery of the horse for the agreed consideration of $500, "which stallion the said plaintiffs did receive, and have kept to this day," and denies each and every other allegation in the petition. The third averment in the answer relates to the question as to whether the horse was sold upon a written or oral agreement. It is conceded by defendant that, for the purpose of this hearing, that question is foreclosed against him by the verdict of the jury. It, therefore, will not be considered.

At the trial upon these pleadings the court instructed the jury as follows:

"No. 2. The burden of proof is upon the plaintiffs to establish by a preponderance of the evidence, as to the stallion, that they purchased said stallion for breeding purposes, at an agreed price of $500, and that they paid to defendant the said sum of $500; * * * that said stallion was entirely worthless for the purpose for which he was sold and purchased, and that the plaintiffs were damaged by reason thereof in the sum of $500."

"No. 5. The jury are instructed that, if you find in favor of the plaintiffs, then it will be your duty to allow the plaintiffs interest on the $500, being the purchase price of said stallion, from April 30, 1907, to the first day of this term of court."

"No. 5½. You are instructed that you have nothing to do with the fact as to whether or not the stallion in question would be good for other than breeding purposes. If the plaintiffs bought him for breeding purposes, and he was not of the kind of horse that the defendant warranted him to be in respect to foal-getting, then the plaintiffs are not required in law to keep the horse at his fair value for any other purposes."

It is apparent from a reading of the pleadings, in connection with these instructions, that the judgment of the

district court cannot be sustained. If the action be treated as one for rescission, the petition is clearly insufficient, in that it contains no allegation that plaintiffs ever attempted to rescind the contract, or that they ever returned or offered to return the stallion to defendant. Such an allegation is necessary to sustain an action for rescission. *McCormick Harvesting Machine Co. v. Knoll*, 57 Neb. 790; *Alfrec Mfg. Co. v. Grape*, 59 Neb. 777.

If the action be treated as one for damages for a breach of warranty, the measure of plaintiffs' damages would be the difference between the actual market value of the horse at the time of its purchase by plaintiffs and its market value had it been as warranted and represented to him. *McClatchey v. Anderson*, 84 Neb. 783. The court failed to recognize either of these rules in its instructions to the jury, and the verdict returned is in excess of any sum which could be returned under either of such rules. The petition does not allege any offer to return the horse by plaintiffs, nor does it allege that the horse was of no value. The only allegation is that it was valueless for the purpose for which they purchased it. The evidence discloses that, while the horse was valueless as a breeder, plaintiffs had worked him for two or three months; that after the horse was "broke" to harness he was "a very nice buggy horse, was a fine looking individual," and a good coach horse.

It is suggested that the judgment might be sustained on the ground of fraud; and it is argued that defendant's agent at the time of the sale made representations as to the quality of the horse, which were false and therefore fraudulent; but here again the petition is defective in not containing any such averments. Moreover, in *Young v. Filley*, 19 Neb. 543, we held: "In an action for damages for a breach of warranty or fraudulent representations as to the quality of personal property sold, where there is no rescission of the contract, the measure of damages is the difference between the value of the property as it actually was and what would have been its value had it

been as represented at the time the representation or warranty was made." In the opinion by REESE, J., our present chief justice, p. 545, it is said: "It is insisted by defendant in error that the petition alleges both a breach of warranty and fraud, and for the purpose of the case we will assume that such is the fact. In either case, where there is no allegation of a rescission of the contract, the measure of damages is the difference between the value of the corn as it really was at that time and what it would have been worth had it been as represented."

It is also argued that in June, 1908, as soon as the horse was found to be valueless, plaintiffs advised defendant of such fact, and that such notice was a waiver of any claim of necessity of a tender. Upon this point also the petition is silent.

In support of their claim for $600 for the care, keeping and handling of the horse during the season following their purchase, which it may be conceded was necessary to demonstrate whether or not he was as warranted, plaintiffs contend that "it seems to be the general rule in cases of breach of warranty for special purposes, etc., the damages should be such as may fairly and reasonably be considered rising naturally, that is, according to the usual course of things from the breach, or such as may be reasonably supposed to have been within the contemplation of the parties at the time, as the probable result of the breach." Upon this point we said in *Mundt v. Simpkins*, 81 Neb. 1: "A sale of personal property with a warranty of its fitness for a prescribed use may be treated as a sale upon condition subsequent at the election of the purchaser, and in the event of a breach of the warranty the property may be restored and the sale rescinded." Plaintiffs have not brought themselves within this rule by claiming a rescission and offering to restore the horse.

For the reasons above outlined, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

HAMER, J., dissenting.

I am unable to agree with my associates in this case. I start out with the legal proposition that misrepresentation, deception and fraud in the sale of personal property resulting in damages to the vendee, if shown by competent evidence, will support a judgment in his favor whether the action be only for a breach of warranty or for fraud and deceit. Under the application of the rule stated, the evidence in this case is clearly sufficient to sustain the judgment of the trial court. The stallion in this case was sold purely for a breeder. The agent of Coad, Mr. Hall, in order to induce the purchase, said to the plaintiffs, "You can't lose nothing buying this horse. We will guarantee him. We know him to be a breeder. We have two or three colts out of him now down at Mr. Coad's ranch at Fremont." He also presented to plaintiffs a printed circular describing the horse as "Bay Billy, by W. J. Bryan, 2389, foaled May 1, 1901; he by Kadris, 284; dam, Queen, Hambletonian Mare; Bay Billy is a fine five-year-old coach stallion. He comes of good lineage, and is worthy of all good things that can be said of him, and has proved a sure foal-getter in our hands." Mr. Hall knew that these representations were false. He knew that there were no colts at the ranch from this horse, or anywhere else. There could be no case containing a greater amount of deceit than this case. The purchasers desired a good breeder and sure foal-getter. The defendant's agent told them that that was just what they were getting. To get such a horse the plaintiffs paid $500 in cash. They employed a man to take care of the horse. They were put to the expense of $600 in taking care of him. If I understand this court aright, it determines that the plaintiffs shall find Coad, if they can, and "tender" to him the horse in question; that is, they shall have a halter on the horse, and shall send him up and down the country accompanied by a caretaker until they can find Coad, and then, having the horse with them, they are to

Sherrill v. Coad.

offer him the halter strap so that he may lead the horse away. There was no contention concerning the fact that $500 had been paid as the price of the horse by the plaintiffs, and there was no serious contention but that it cost the plaintiffs $600 to keep him until the suit was brought.

It certainly is not debatable that, if Coad told the plaintiffs, or either of them, that he would not receive the horse back, that of itself would relieve the plaintiffs from attempting to return him. What was said on this subject? The parties met at Chadron. Coad was there in one of his other stallion cases. Sherrill told Coad that the horse would not breed. On cross-examination Coad admitted this talk. Coad was told by Sherrill that he could have the horse back. On cross-examination Sherrill testified: "Q. When was that? A. Why, since I have been in Chadron. Q. Who was present? A. He and Mr. Hall and Muzzey." This conversation happened at Chadron. It is not denied. In order to render the majority opinion, the other members of the court seem to shut their eyes to these facts. They do that or they ignore them. At that time the horse was at Crawford, only 28 miles distant from Chadron. Coad could not have meant by what he said anything except that *he would not receive the horse back*. Second. But, if there is any doubt upon this question, it is forever settled by the fact that Coad *answered* setting up the alleged fact that there was a bargain to the effect that, if the horse turned out *not* to be a sure foal-getter, he was to be returned to Coad at Fremont, and that Coad was to furnish the plaintiffs another stallion that would be a sure foal-getter. When Coad makes this defense, how can it reasonably be contended that Coad would receive the horse back if it was offered to him? Coad tenaciously hung on to this defense until the jury determined it against him. Why should the majority of the court refuse to listen to the evidence which determines this stubborn fact beyond all question?

Where a party intentionally and by deceit produces a false impression in order to mislead another, or to entrap

him, or to obtain an undue advantage over him, it is then a case of positive fraud in the true sense of the term. In every case where there is positive fraud, the man who perpetrates the fraud is entitled to no standing. *Mc-Cready v. Phillips*, 56 Neb. 446. Coad is no more entitled to protection against the deceitful act perpetrated, than was the criminal who "gold-bricked" a prominent banker from the central part of this state a few years ago, or Mabry and his gang, who "confidenced" victims from all classes and from all parts of the United States. Coad by his answer said: "I will not take the stallion back and give you your money. You can bring me the stallion, but you must take another stallion in place of him. I keep your money." In the face of Mr. Coad's contention, how can there be any doubt about it? No man who practices a "confidence game," and by the deception of an unsuspecting and innocent person, and without other consideration except the use of *some instrument* as the basis of such deception, should be permitted to successfully interpose the well-intentioned forms of the law adapted to ordinary commercial transactions as a shield to ill-gotten fruits of his iniquity, and such instrument, whether of a trifling or substantial value, is not entitled to special consideration at the hands of the court. Courts are in some instances called upon to lend their aid to a skillful and unprincipled wrongdoer who uses the form of the law to accomplish his wicked purpose. In *Graffam v. Burgess*, 117 U. S. 180, 186, Mr. Justice Bradley, delivering the opinion of the court, said: "It is insisted that the proceedings were all conducted according to the forms of law. Very likely. Some of the most atrocious frauds are committed in that way. Indeed, the greater the fraud intended, the more particular the parties to it often are to proceed according to the strictest form of law."

It is a mistake for the majority to rule that the plaintiffs shall not be allowed to recover for the injury that has been done to them through the deception practiced upon them by the defendant Coad and his agent, Hall. It

is the impractical nature of the majority opinion which makes men look askance at a "legal decision." The difficulty with the majority opinion would seem to be that it fails to take notice that there may be *three* or *more* things instead of *two*. If I may use the illustration, the opinion is along the line that all wagons must be red wagons or green ones, while I think there are no good objections to wagons of other colors. It is an idea of ancient legal learning that there can only be two suits in this class of cases; one to recover for the injury done—claimed to be the difference between the true value of the thing sold and its sale price—and the other, to recover back the price paid for the article sold, based upon a rescission of the sale. Under the first theory, the purchaser must *keep* the article which he was *deceived* into purchasing. He is bound to keep it, although he never intended to buy, and would not have bought it if he had known the actual facts surrounding it, and though induced by deception to make the purchase, he *must* sue for the *difference* in value between what it is actually worth and the sale price. The other idea is that, before there can be a recovery, there must be a rescission of the contract. I maintain that this doctrine is obsolete in all cases of wilful fraud and deception. The majority opinion is not justified by common sense as applied to business. It is a contention for overtechnical nicety. It would have done great credit to the period of 200 years ago. I am trying to make the contention that the law is something to which common sense—just ordinary business sense—may be applied, just as it may be applied to other occupations, to farming, to surgery, and to merchandizing. The great danger is that the application of the law is likely to be unnecessarily mixed with a tincture of fictitious and far-fetched learning that is, or ought to be, obsolete. In this case the purchase was clearly brought about by the misrepresentation of Hall, the agent of the defendant, Coad. What he said was wholly false. There were no colts from the horse at Fremont. The horse was unable to get foals. Hall and

Coad knew that.  Coad comes into this court and asks this court to lay down the doctrine that, notwithstanding the deception which he practiced upon the purchasers, they *are bound to keep* the horse for whatever he is worth, although they did not buy him for *any other purpose* than to be a foal-getter, and he is absolutely worthless for that purpose; or, they are bound to find Coad, wherever he may be, and to "tender" the horse back.  And they are bound to do this, although Coad has said that he would *not* take the horse back, and has made a long and strenuous contention attempting to prove that there was to be an exchange of stallions if the horse turned out not to be a foal-getter, and has been beaten.  The majority opinion imposes upon the plaintiffs the burden of hunting up Coad, who was always a difficult man to find because he was continually going from one end of the state to the other, besides making trips into Wyoming, Colorado and Chicago.  Under the majority opinion, the plaintiffs are to be forever burdened with taking the horse along with them from one end of the state to the other looking for Coad.  They are always to have the horse on hand to offer him to Coad.  The thing proposed to be done is impracticable and wholly unbusinesslike.

The pleadings and facts allege and show deception. The plaintiffs were defrauded out of the $500 that they paid for the horse, and they were compelled to keep the horse about a year before they could know that he was not a breeder, and that he was sterile and wholly without capacity as a breeder.  The plaintiffs have lost the money which they expended in keeping the horse.  It is the idea of the writer that, when the deception is alleged and proved, the plaintiffs ought to be allowed the damage that they have suffered by reason of such deception, and that it is immaterial whether they tender back the instrument used to deceive or to accomplish the deceit intended. The plaintiffs have not refused to give Coad his horse. Coad never demanded the horse.  Besides they have told him that he could have the horse.

The effect of the majority opinion is to offer a premium for the practice of deception, and that premium is that the purchasers shall be compelled to keep the horse in any event if the seller, by *any sort* of misrepresentation and fraud to the purchaser, gets the horse delivered to the man he deceives. Suppose the case of one who is "goldbricked." Suppose that by deception the swindler gets out of the purchaser $5,000 for his gold brick, and the purchaser is fortunate enough to discover the deception, and he finds the man who has deceived him, and sues him to recover the $5,000 out of which he has been defrauded. Then, suppose the defendant coolly meets the plaintiff with the proposition that the brick was actually worth $7.50; that the actual brass, copper and lead contained in it were of the value of $7.50; and then insists that there was no offer to return the brick, and he objects to the plaintiff's right of action on the ground that there has been no "tender" to him of the brick. There is no difference in principle in the actual case and the case supposed. This case is the same as any other case where confidence men secure victims by misrepresentation. It is time that our courts refused to coddle confidence men who secure victims by selling stallions that are known not to be breeders, or by selling gold bricks, or by promoting sham prize fights and sham races, after the manner of the Mabry gang. There is no good reason why the judgment of the district court should not stand. It is the judgment of a practical business judge who is a good lawyer and 12 practical business men and farmers who sat on the jury.

Section 92 of the code provides what the petition must contain: "First. The name of the court and county in which the action is brought, and the names of the parties, plaintiff and defendant. Second. A statement of the facts constituting the cause of action, in ordinary and concise language, and without repetition. Third. A demand of the relief to which the party supposes himself entitled." The provisions of the code touching the contents of the petition permit any statement of facts to be

made which constitute the cause of action, and no form
of language is required, and there is no restriction ex-
cept that the story is to be told without repetition. The
language used is "ordinary language." We make the
point that any statement complying with the code, as
above quoted, and that demands relief and is supported
by sufficient evidence entitles the litigant to recover.
Section 90 of the code specifically provides that the rules
of pleading heretofore existing in civil actions are abol-
ished, and that the forms and rules by which the suffi-
ciency of a pleading is to be determined are only such
forms and rules as are "prescribed by this code." There
is, therefore, no reason whatever to go to any of the old
forms. The pleader is simply to tell his story, and if that
story is sufficient, and is supported by the evidence, then
he is entitled to the relief which his story gives him.
There is nothing in our code touching the pleadings in
this case which compels the use of a particular form for
a breach of warranty or deceit. If the "law" demands
something that is not in the code, then I demand that this
court shall change what it calls the "law," because there
is nothing that requires this court to stand by an ancient,
inappropriate, and obsolete doctrine which has been legis-
lated out of existence. The defendant asks this court to
protect him in the practice of his deception. He asks that
the mode used shall be after the manner of an ox wagon
or a donkey's cart, when there are carriages, beautiful
horses and automobiles all about.

In *Martin v. Hutton,* 90 Neb. 34, defendant falsely rep-
resented to the plaintiff that a certain quarter section of
land was not subject to entry because of a homestead
filing thereon, and that he (Hutton) would secure a re-
linquishment of that filing for $2 an acre, or $320 all
told. Hutton received the money from the plaintiff.
There was no consideration for the payment of the money,
because the land was all the time subject to entry, and
Hutton obtained it from the plaintiff by fraud. In a suit
by the plaintiff to recover the money back, the defendant

30

seems to have contended that the plaintiff, as a condition precedent to prosecuting the action, was required to rescind the contract. The plaintiff lived on the land. Hutton wanted him to give it up. He made the same contention Coad does, only Coad says there was no rescission of the contract, and that the horse was not tendered back to him. The contention was overruled, and there was judgment for the plaintiff for the full amount of money out of which the defendant had defrauded him.

In *Warder, Bushnell & Glessner Co. v. Myers*, 70 Neb. 15, the plaintiff undertook to repair a harvesting machine so that it would do good work, and, if it did not do good work, it was to be taken back by the plaintiff and the defendant's note surrendered. In a suit upon the note, where the defendant answered that there was a failure to repair and furnish such a machine as was agreed upon, the plaintiff objected that it was nowhere alleged in the answer that there was an offer to return the machine and rescind the contract, or any demand for the return of the note, or any notice to the plaintiff. This court said that an allegation of notice and rescission of the contract was not necessary in order to tender a valid defense, and that "the plaintiff undertook affirmatively, under the agreement, to repair the machine and to put it in good working order, or take it back and return the defendant's note. This it failed to do, and, until it had complied with the terms of the agreement, it had no cause of action on the note, the consideration of which, because of its neglect and refusal to put the machine in good working order, had, by reason thereof, failed. It was not a question of rescission of contract, but of compliance with its terms on the part of the plaintiff, in order to entitle it to a recovery on the note sued on." Applying the doctrine to the instant case, the defendant would have had no cause of action if he had brought suit upon the note given for the purchase price of the horse, and simply because he did not furnish a stallion such as he had agreed to furnish—a stallion with the breeding power to get colts

—and neither does the defendant have any defense, for the same reason.

In *Murray v. Mann,* 2 Exch.' (Eng.) *538, the agent sold a horse, very much as the agent in the instant case. The agent took the horse back and refunded the purchaser the money which he had paid. If Hall had taken the stallion back and had repaid the plaintiffs the purchase price, there would have been a still stronger similarity between the cases. If Hall and the plaintiffs had together endeavored to trade back, they could have been met by the principal, Coad, with the proposition that they had no right to trade back, and that was the proposition with which the principal in the English case met his agent, the livery stable keeper. *Hammatt v. Emerson,* 27 Me. 308, 46 Am. Dec. 598, and *Eames v. Morgan,* 37 Ill. 260, seem to justify the contention I am making. Coad's evidence admits the deception.